### CARSANEGO v. WHEELER and another.

*(District Court, S. D. New York.   May 2, 1883.)*

1. DISCHARGING CARGO—CHARTER-PARTY—PHYSICAL OBSTACLE.
    Where by a charter-party the vessel is to go to certain docks to discharge, "or as near thereto as she can safely get," and there discharge her cargo "at a proper discharging berth," and the owner of the docks refuses to permit the discharge of the cargo on the wharf, or the necessary use of the wharf for the purpose of putting in lighters, *held*, such refusal is in the nature of a permanent physical obstacle which entitles the ship to resort to the alternative place of delivery, namely, "as near thereto as she can safely get."

2. SAME—LIABILITY OF CHARTERER.
    Where, upon the charter of a part of a ship, the charterer undertook to receive the cargo as fast as the vessel could deliver, "after ship is in a proper discharging berth," with no other stipulated period for delivery, *held*, that the charterer was not liable for any detention of the vessel until she had found a berth where she could make delivery of the cargo.   The vessel not being able to find a proper discharging berth for the respondents' part of the cargo in the docks where she had first gone, *held*, the respondents were not bound to pay for expenses for removal to another berth where she could discharge.

3. SAME—DEMURRAGE.
    After a proper berth was found, the receipt of the cargo having been delayed through delay by a United States weigher in weighing the cargo as put upon the wharf, *held*, the charterer was answerable for the detention thus caused.

In Admiralty.

*Beebe, Wilcox & Hobbs,* for libelant.

*Stephen P. Nash,* for respondents.

BROWN, J.   This action was brought to recover damages in the nature of demurrage for 17 days' detention of the Italian bark Amicizia, in the delivery of 246 tons of old scrap-iron, in the month of July, 1880.

On the ninth of April, 1880, a charter-party was executed between the libelant, as master of the vessel, and the respondents, by which it was provided that the vessel should carry "say 250 tons of old scrap-iron" from Plymouth, England, to New York; that the ship "being so loaded shall therewith proceed to New York, United States, only Atlantic dock, with liberty to take other cargo to New York for ship's benefit, or so near thereunto as she can safely get, and deliver the same to the order of the charterer," etc.,   *   *   *   "and to be discharged as fast as captain can deliver after ship is in *a proper discharging berth;* cargo to be ready for shipment and along-side on the sixteenth inst., at not less than 35 tons per day or days to count. All days on demurrage over and above the said laying days, at fourpence per British measurement ton per day."

On April 26th, 246 tons of iron were shipped to the respondents, in pursuance of the charter, for which a bill of lading was on that day given upon the terms of the charter-party. The bark was 472 tons Italian register; and after taking the iron on board, took about 250 tons of chalk from other shippers. On arrival at New York the bark went to Commercial wharf at the Atlantic docks, where the chalk was discharged. On the first of July the captain gave notice to the respondents that he would be ready to discharge the iron on the following morning. On the second of July a similar notice was sent, with the request to send lighters along-side to receive the iron. In the afternoon of the 6th further notice was sent by the captain that he would hold the respondents liable for all detention, "as lighters are not along-side, so the vessel cannot discharge." On the same day respondents replied: "We don't know why you should talk of demurrage under the circumstances; we have not asked you to wait for lighters; put it on dock when ready to discharge." On the same day the captain replied he would commence discharging to-morrow morning, "and if I find it impossible to continue, shall be obliged, as already stated, to hold you responsible for the detention."

On the 7th he writes: "I commenced to discharge the iron on pier this morning, but was prevented from continuing by dock-master; so please send lighters to receive cargo." The evidence showed that after the discharge of a few tons, the owners of the dock, finding that the iron was not designed to be stowed in their warehouses, refused to permit it to be landed. On the same day the respondents replied that lighters had been sent for the iron and could not get it, and so, "if boat discharges where it is not allowed on dock, we cannot see that we are to blame for it." On the same day, and also on the eighth of July, lighters were in attendance, and some iron was put aboard of them; but some pieces were found to be so large and heavy that they could not be safely weighed on board the lighters as discharged from the ship, nor without the use of the wharf for that purpose; and permission for such use was, as I understand the evidence, also refused.

On the 9th the libelants wrote: "I beg to state that if you do not furnish some dock for removal of my vessel to place where iron can be properly weighed, the discharge of same will have to be discontinued, and I will hold you responsible for detention;" to which the respondents answered, on the 9th, that it did not devolve upon them to move the vessel, although they would pay the expense of it under protest, and requested the agent of the vessel to attend to it.

On the the 10th they notified the agent of the vessel that unless she arranged to discharge and weigh the iron, they would hold the captain for demurrage, *i. e.*, for the lighters sent there. On the 12th the libelant's attorneys again notified the respondents of the liabilities they were incurring for demurrage. On the 13th the respondents say: "We will, of course, aid you in receiving berth elsewhere; we will look about for another berth and report later;" and subsequently on the same day wrote, "She can dock at the foot of Thirteenth street; the captain must investigate, and if satisfied with the position of things, go up at once." On the following morning, the 14th, the vessel went to Thirteenth street, but was unable to obtain a proper discharging berth until the 16th, when she obtained one at Little Twelfth street, and the discharge was finished on the 24th.

Upon these facts the claim for demurrage may be considered in reference to the detention before the ninth of July, and that which occurred afterwards. On that day it seems to have been ascertained for the first time that the delivery of the iron at the Atlantic docks, where the vessel then was, was impracticable on account of the refusal of the dock-master to permit it to be landed, even for the necessary purpose of weighing and delivering into lighters.

In all claims for demurrage, or damages in the nature of demurrage, regard must be had to the special provisions of the charter-party, or bill of lading, and no recovery can be had except upon proof of a breach of its condition, or of some other legal obligation of the parties. In this case the provisions of the charter-party are peculiar. The vessel stipulated that she should be required to go to the Atlantic dock only. This stipulation was evidently inserted for her own benefit. She was expecting to take in other cargo, as she in fact did. She had been at the Atlantic docks before; she discharged the chalk there, and it was designed to provide that she should not be obliged to go elsewhere to discharge the iron. The charterers, on the other hand, as clearly, for their own protection, stipulated that they were not to be answerable in regard to the unloading until the vessel was "in a proper discharging berth;" and thereafter they were willing to bind themselves "to discharge as fast as the captain could deliver."

The refusal of the owners of the dock to permit the use of the wharf for the delivery of the iron was a circumstance evidently not foreseen by either party, and, so far as appears, it was without the fault of either. Neither, therefore, was in default under this particular

charter-party, which did not bind either to a delivery or acceptance within any specified time; and hence neither had any claim against the other in respect to this unforeseen prohibition. *Duff* v. *Lawrence,* 3 Johns. Cas. 162, 169. If the owners' assent to the use of the wharf for the purpose of weighing might have been procured for a compensation, it was the business of the ship, and not of the charterers, to procure it. The right to the use of a wharf for such purposes is part of "wharfage;" and by the charter-party "all port charges, dock and canal dues of the vessel" were to be paid by her owners. So far as respects the ship's claim for demurrage, therefore, while at the Atlantic docks, it is immaterial whether she could not obtain this assent, or refused to pay any necessary charges therefor. From the evidence, though meager in this respect, I think it is to be inferred that permission was refused.

It is plain that while at Commercial wharf the ship was not at "a proper discharging berth" within the meaning of the charter-party, because she could not discharge in the only manner in which it was possible to receive the iron ; namely, upon the wharf, or upon lighters, with the necessary attendant privilege of weighing upon the wharf. The ship under this charter was bound to obtain such "a proper discharging berth," before the responsibility of the defendants for any delay at the Atlantic docks could attach. As she did not do so, I cannot hold the respondents liable under this charter-party for any detention up to the ninth of July, when the impossibility of discharging there was first fully ascertained.

A delivery of the cargo according to the provisions of the charter-party having thus become impossible through the refusal of the dock-master to permit it to be landed, the situation was analogous to that of a permanent unforeseen obstacle arising to prevent performance in accordance with the agreement of the parties. That such a refusal is equivalent to a permanent, physical obstacle, was first determined in the recent case of *Nelson* v. *Dahl,* 12 Ch. Div. 568, a case very similar to the present in this respect, and elaborately considered. The charter-party in that case provided that the steamer Euxine, with a cargo of deal timber should proceed to London, Surrey Commercial docks, (which were private docks,) or so near thereunto as she may safely get, and be discharged as fast as steamer can deliver, with 10 days on demurrage, at £30 per day. The steamer arrived at the docks, applied for admission, and was refused, because they were full, and it was likely to be some months before she could be discharged there. She thereupon was taken to Deptford buoys, the nearest place at which

she could safely lie moored, and the consignees were notified to discharge on lighters,—a not unusual, but not obligatory, mode of discharge. The consignees having refused to receive the cargo there, the owners of the vessel provided lighters and took the cargo into the Surrey Commercial docks, and thereafter sued the charterers for the detention. In the court of appeal, reversing the decision of JESSEL, master of the rolls, it was held that the plaintiffs were entitled to recover; that the refusal of the dock-owners was analogous to a permanent, physical obstacle, which authorized the ship to resort to the alternative provision in the charter-party, namely, to go "as near to the docks as she could safely get;" and that the defendants were bound to accept delivery of the cargo there in lighters, as they might have done. This decision was affirmed in the house of lords, (6 App. Cas. 38;) and a similar decision was made under a similar charter-party in the Scotch case of *Bremner* v. *Burrell*, 4 Cas. in Sess. (4th Series,) 934.

The receipt of the cargo in lighters away from the wharf could not, however, be required of the consignee where the charter-party or bill of lading plainly provides for or implies a discharge at a wharf, if a suitable wharf were procurable, as I have held in the recent case of *Gronstadt* v. *Witthoff*, 15 FED. REP. 265, 274; nor can the rule apply to a general ship which is bound to find her own berth and make delivery at a wharf, in the absence of any usage to the contrary. *Irzo* v. *Perkins*, 10 FED. REP. 779.

In the case of *Nelson* v. *Dahl*, the charterer insisted upon a delivery in the Surrey docks, because lumber coming through those docks was in better repute, and brought a better price. The decision in that case in the court of appeals was also put upon the further ground that it was the practice for the consignee to make arrangements for an unloading berth, which it was, therefore, held to be his duty to provide. In the latter respect the present case is different, as under this charter-party the vessel clearly undertook to provide her own discharging berth at the Atlantic docks, before the obligation of the consignee to receive the cargo commenced. That case is pertinent, however, as regards the effect of the refusal of the dock-master to permit the discharge at Atlantic docks. Each party was thereby disabled from performing his part of the agreement for the discharge and acceptance of the cargo at those docks. The acts of both were, by the contract, to be concurrent,—of the ship, in delivering, and of the charterer, in receiving the cargo. The vessel could not discharge at the Atlantic docks, because the dock-owner would not permit it;

and for the same reason the consignee could not receive the goods there, as he had agreed to do. The inability of each was, so far as appears, without any fault of his own. Neither party, therefore, being in a condition to perform, and neither in fault, neither can sue the other for the delay, in the absence of any stipulation as to time.

Upon this ground the case of *Ford* v. *Cotesworth*, L. R. 4 Q. B. 127, was decided, where the unlading of the cargo in accordance with the charter was interrupted by the public authorities at Lima, and it was held that for the period of delay thus caused the charterer was not liable. The same rule was applied in *Cunningham* v. *Dunn*, 3 Com. Pl. Div. 443, where there was no agreement to unlade within a specified time. See, also, *Kay* v. *Field*, 10 Q. B. Div. 241.

In *Ford* v. *Cotesworth*, BLACKBURN, J. says, (p. 133:)

" Where the act to be done is one in which both parties to the contract are to concur, and both bind themselves to the performance of it, there is no principle on which, in the absence of a stipulation to that effect, either expressed by the parties or to be collected from what they have expressed, the damage arising from an unforeseen impediment is to be cast by law on the one party more than on the other, and consequently we think that what is implied by law in such a case is, not that either party contracts that it shall be done within either a fixed or a reasonable time, but each contracts that he shall use reasonable diligence in performing his part. * * * We think that delivery of the cargo is as much the duty of the ship-owner as of the merchant, and consequently that the contract, implied by the law, in the absence of any stipulation in the charter-party, is that each party shall use reasonable diligence in performing his part of delivery at the port of discharge, the merchant being ready to receive in the usual manner, and the owner, by his captain and crew, to deliver in the usual manner. * * * We think that the contract which the law implies is only that the merchant and ship-owner should each use reasonable dispatch in performing his part. * * * The delay having happened without fault on either side, and neither having undertaken by contract, express or implied, that there should be no delay, the loss must remain where it falls." See, also, *The Teutonic*, L. R. 4 P. C. 171, 181–3; *The Argos*, L. R. 5 P. C. 134, 160–4.

The same considerations apply as respects the detention of the vessel after it was finally ascertained that no discharge, either upon the wharf or in lighters, could be made at the Atlantic docks—namely, from July 9th until July 16th, when she obtained a discharging berth at Little Twelfth street.

It is urged that the obligation of the ship to obtain a discharging berth before the charterer's liability commenced was an obligation having reference only to the Atlantic docks; and that the obligation

of each, when it was found that delivery could not be made there, should be considered, the vessel having then only iron on board, the same as if she had arrived and reported on the ninth of July to the respondents as sole charterers, and that the respondents were, therefore, bound to use diligence in directing the ship to a proper place of discharge, as in such a case they would have had a right, and would have been bound, to do. *Davis v. Wallace,* 3 Cliff. 123, 133; *268 Logs of Cedar,* 2 Low. 378, 379; *Henley v. Brooklyn Ice Co.* 14 Blatchf. 522.

This construction cannot, however, be adopted consistently with the plain reading of the charter-party, which provides, as an alternative, that if she cannot get to the Atlantic dock the ship "shall proceed as near thereunto as she can safely get, and deliver the cargo to the order of the charterer, to be discharged as fast as captain can deliver after ship is in a proper discharging berth." The provision that the ship shall make a delivery of the cargo, and the condition and limitation of the charterer's liability that the ship must first be "in a proper discharging berth," cannot be separated from the alternative provision that the ship was to go "as near to the Atlantic docks as she can safely get." Having this alternative provision in her favor in the charter-party, the ship had a right to act upon it from the moment she discovered that the iron could not be delivered at the Atlantic docks, as she might have acted upon it before entering the docks at all, had it been then known that permission to land it would have been refused by the owners of the dock. This alternative clause, therefore, took away the right of the charterers to direct the ship, which they might otherwise have had, and authorized the vessel to go to the place nearest the Atlantic docks, where she could fulfill the obligation of the charter-party, and make delivery of her cargo "at some proper discharging berth."

The captain had no right, therefore, to demand of the respondents, as he did in his letter of the ninth of July, either to furnish another dock, or be at the expense of taking the vessel there. Several days' delay ensued in the dispute regarding this obligation, and when on thirteenth of July the respondents suggested the dock at Thirteenth street, subject to examination by the master, this, in contemplation of law, was purely voluntary, and did not add to respondents' legal obligations. The vessel was at all times at liberty to select her own dock under the alternative provision of the charter, and time lost by her in securing one must, therefore, fall upon her. The expense of

removal to the dock suggested by the charterers must also be borne by the ship, as it must have been borne by her had she gone directly to some other dock of her own selection.

A proper discharging berth at Little Twelfth street was obtained in the forenoon of the 16th; the discharge was finished between half past 3 and 4 of the 24th. Some iron was discharged every day during this period, excepting one Sunday intervening. Evidence was given on the part of the libelant to show that the vessel could have been discharged in five days at the rate of 60 tons per day. Other evidence was to the effect that this could only be done by unusual and extraordinary efforts, and that from 35 to 45 tons per day was all that could be discharged from the vessel by her crew with ordinary diligence. The charter-party itself mentions 35 tons as the least rate per day. The captain testified to delay in discharging from the accumulation of iron upon the wharf; and on the 21st the ship's agents wrote to the respondents complaining of this accumulation and of the absence of the United States weigher, and that "they had taken the trouble to go to the weigher's office and begged them to send some one there to weigh the iron."

On the whole I am satisfied that there was some delay in receiving the 246 tons of iron after the vessel was properly discharging in the forenoon of the 16th; that five and a half days were ample time for receiving the iron at the rate of about 45 tons per day, which should have been discharged, therefore, on the 22d.

The respondents should be charged, therefore, with two days demurrage, amounting, according to the terms of the charter-party, to $76.20, with interest from July 24, 1880, making in all $88.89, with costs.

See *Williams* v. *Theobald*, 15 FED. REP. 465.