TEILMAN *v.* PLOCK and others.

*(District Court, S. D. New York.* June 20, 1883.)

1. DUTY OF SHIP TO FIND BERTH.
In the absence of any agreement or contrary usage, it is the duty of a general ship to find a berth where she can discharge on the wharf.

2. SAME—BILL OF LADING.
On a bill of lading providing that iron rails should be discharged "at the same place as the other cargo—only one place," *held,* the duty of the ship to go to a berth where the rails could be discharged on the wharf.

3. SAME—DETENTION—DEMURRAGE.
Where the bark A., while discharging petroleum barrels before reaching her berth, gave notice of readiness to discharge the iron rails, and was at a dock where the privilege of landing the rails was refused, even for the necessary purpose of weighing them in the course of discharge, and negotiations in respect to the discharge from the vessel upon lighters were not completed through the mate's not giving unqualified permission to weigh the iron on the ship's deck, *held,* that the defendant was not legally in default, and was not liable for demurrage for the vessel's delay at the dock where she was not allowed to land the rails.

In Admiralty.

*Beebe, Wilcox & Hobbs,* for libelants.

*Edward S. Hubbe,* for respondents.

BROWN, J. Demurrage to the amount of $129.60 is claimed in this case for three-days' detention of the Norwegian bark Anna in the delivery of 181 iron rails in September, 1880, consigned to the respondents. The cargo, which was consigned to several different consignees, consisted of pig-iron stowed at the bottom; next, the iron

rails, weighing only about 35 tons; and on top some 600 empty petroleum barrels. The clause in the defendant's bill of lading relating to discharge was as follows: "To be discharged in the same place as the other cargo—only one place; to commence imminently" (immediately?) "after arrival of the ship, and discharge without delay; other terms as per charter-party." By the charter, to which the respondents were not parties, £9 per day demurrage were to be paid.

The bark arrived in New York in the latter part of August and went to Atlantic docks. Shortly after, on September 1st, she was visited by Capt. Gillen, who was in charge of the lighters by which it was expected to receive the rails, and he was told by the mate that the barrels would not be discharged for several days. The bark did not at first get a berth at the wharf, but discharged the barrels while lying outside of another vessel. This was finished by 9 A. M. of Saturday, September 4th. In the afternoon of that day she got along-side a wharf. The custom-house permit for delivery of the rails had been previously handed to the mate by Gillen. On Saturday it was returned to Gillen, who gave it to the United States weigher, by whom it was necessary that the rails should be weighed as delivered from the vessel. As the vessel had no berth along-side till Saturday afternoon, the iron could not have been delivered on the wharf so as to be weighed until Monday. A special custom-house permit could easily have been obtained to weigh the iron on the deck of the vessel. Gillen on Saturday applied to the mate for permission to weigh the iron on deck, preparatory to receiving the cargo on lighters. There is some conflict as to the reply of the mate to this request. I am satisfied, however, that he did not give any unqualified permission, but required Gillen to apply to the captain, who was away from the ship, or to the ship's agent in New York. This Gillen declined to do. On Tuesday the vessel was moved to Merchants' Stores, where all the rails were on Wednesday put upon a wharf, weighed, and thence transfered to Gillen's lighters; and the pig-iron was discharged there also.

The iron rails formed but a small part of the cargo, and the vessel was in no way directed by the respondents to the Atlantic docks or to Merchants' Stores, and the respondents had no control over her movements. The libelants claim compensation for the delay of Saturday, Monday, and Tuesday.

In the absence of any agreement or usage to the contrary, it was the duty of this vessel, as a general ship, to find a berth where she could discharge the rails on the wharf, unless relieved from that burden by some different arrangement, and until then the respondents' duty to commence the discharge did not begin. *Irzo* v. *Perkins*, 10 FED. REP. 779; *Gronstadt* v. *Witthoff*, 15 FED. REP. 265. There was no contract in this case to receive the rails on lighters. The repeated proposals to receive them on lighters was subject to the necessary condition of some arrangement for weighing the iron; and the use of

the ship's deck for this purpose was not authorized by the mate. It was his business, and not Gillen's, to seek the captain or the agents of the vessel to get authority to give that permission, since the whole arrangement was for the purpose of expediting the delivery of the rails and of relieving the vessel from an obligation to deliver on the wharf, which she was not then in a situation to do. For want of permission to weigh on deck, no arrangement was completed for delivery by lighters, and the burden still remained on the vessel to find a proper place of discharge, which she did not do until the following Wednesday.

Moreover, it appears by the testimony of Thompson that the iron rails were not allowed to be landed at the Atlantic docks, as was the case also in *Carsanego* v. *Wheeler*, 16 FED. REP. 248; and I have recently held, in the case of *Gronstadt* v. *Witthoff, supra*, that one of several consignees of goods on a general ship, who has no right or power to direct the vessel to a berth, is not responsible for the detention of the vessel until she has reached a berth or proper place to discharge, and is in actual readiness to discharge according to her legal obligation, unless there be some different express contract making the consignee liable before that time. On Saturday afternoon the vessel got a berth along-side the wharf, so that if the rails had been allowed to be landed there, the respondents would have been bound to discharge them during Monday. In answer to a question from the court, Thompson, the libelant's witness, stated explicity that the iron rails were not allowed to be landed at Atlantic docks, even for the purpose of weighing. If the iron rails and pig-iron would have been suffered to be landed there, no reason appears for the vessel's going to Merchants' Stores, nor any reason why notice of her readiness to deliver at Atlantic dock after she got a berth on Saturday afternoon was not given. But as the discharge of the rails was not premitted there, even for weighing, the respondents cannot be charged for any delay of the bark at the Atlantic docks.

The stipulation of the bill of lading that the vessel should go to only one place of discharge, could have no force in charging the respondents for delay, unless the dock which the vessel selected was one where she could land the entire cargo, or at least the respondents' part of it. As the respondents were not legally bound to accept delivery on lighters, and as no arrangement was perfected for delivery on lighters while at Atlantic docks, through want of any arrangement for weighing the rails, the vessel must bear the loss occasioned by her first going to a place of discharge where she could not make delivery of the respondents' part of the cargo, as in the case of *Carsanego* v. *Wheeler*, above cited. After reaching Merchants' Stores there was no delay or detention, and the libel must, therefore, be dismissed, with costs.