TEILMAN *v.* PLOCK and others.

*(Circuit Court, S. D. New York.* July 30, 1884.)

1. DEMURRAGE—CHARTER-PARTY—MASTER—CONSIGNEE—CARGO—PLACE OF DISCHARGE.

When a charter-party specifies that the cargo shall be discharged at the same place as the other cargo, such discharging to commence immediately after arrival of the ship, in order to recover demurrage from the consignee, the master must show that he provided a suitable place for discharging the goods, or his inability to do so, or else some circumstance relieving him of his duty to provide such suitable place.

2. SAME—WHAT IS A "SUITABLE PLACE."

A suitable place for discharging iron rails is not a place at which the customs officers will not weigh such article, and is not a place where the owners of the wharf will not permit iron rails to be landed.

In Admiralty.

*Beebe, Wilcox & Hobbs,* for libelant.

*E. S. Hubbe,* for respondent.

WALLACE, J.     This is a libel by the master of the Norwegian bark Anna against the respondents, as consignees of part of the cargo, for demurrage for three days' detention in discharging cargo.    The cargo was carried under a charter-party with one Wissman, and was consigned to several consignees, and consisted of empty petroleum barrels, iron rails, and pig-iron, the barrels being stowed on top.    The respondents were the consignees of the iron rails only, and these were shipped under a bill of lading which, after providing for the terms of freight, specified that the cargo should be discharged at the same place as the other cargo, to commence immediately after arrival of the ship, without delay, and "all other conditions as per charter-party with Mr. Wissman."    The charter-party provided for loading and discharging the vessel with customary quick dispatch, the cargo to be received and delivered along-side the vessel, within reach of her tackles, at consignee's risk and expense; lighterage, if any, to be borne by the cargo, and for demurrage at the rate of £9 per day for each days' detention by default of charterer.

The bark arrived at the port of New York, August 30, 1880, and proceeded to the Atlantic docks to discharge the barrels.    The respondents were duly notified by the agent of the vessel-owners, and asked to attend to the discharge of the rails as soon as the barrels should be discharged, and they promised to send a lighter to receive the rails if they could obtain a custom-house permit.    On September 3d the captain of the lighterman, to whom respondents had given a delivery order, left the order with the mate of the bark, promised to send a lighter as soon as she was ready to discharge the rails, and was informed by the mate that she would be ready the next morning between 9 and 10 o'clock.    At that time she was not along-side the wharf, but was discharging the barrels while lying aside of another vessel.    On Saturday, September 4th, the captain of the lighter called

and got the order back again, took it away, and returned in the afternoon and stated that he could not get permission to discharge the iron from the custom-house authorities unless they were allowed to weigh it on the deck of the vessel. It was not customary to permit a discharge of iron upon a lighter unless the iron was first weighed on the deck of the ship. The mate referred him to the agent of the vessel, who was not on board, to obtain permission, but the captain of the lighter refused to look up the agent. The vessel did not obtain a berth along-side the wharf until Saturday afternoon. The owners of the dock would not allow iron to be landed on their dock even for the purpose of weighing. Nothing more was done in behalf of the respondents, but on Tuesday, pursuant to an understanding that they would receive the rails at Merchants' stores, the bark proceeded there, where on Wednesday the rails were put upon the wharf, weighed, and taken away by the lighter.

If the libelant is entitled to recover any demurrage, it must be upon the theory that the respondents were under obligation either to receive the rails upon the lighter, under the circumstances of the case, or to select a suitable wharf for the purpose. Neither of these propositions can be maintained. By the terms of the bill of lading the respondents became parties to all the conditions of the charter-party except such as were supplanted or modified by the special conditions of the bill of lading. *Davis* v. *Wallace*, 3 Cliff. 130; *Smith* v. *Sieveking*, 4 El. & Bl. 945; *Wegener* v. *Smith*, 24 L. J. C. P. 25. But they were under no obligation to accept a delivery of their part of the cargo upon a lighter, in the absence of proof of any usage of the port authorizing such a delivery by the carrier. The conditions of the charter-party providing for delivering the cargo along-side the vessel at the consignee's risk and expense, and for the payment of lighterage, were undoubtedly intended for the protection of the carrier, and to relieve him from responsibility or expense in protecting or warehousing the cargo, in case the consignees should neglect to receive it after proper notice. Other than this they imposed no exceptional liability upon the respondents. The charter-party and the bill of lading, together, import an obligation on the part of the consignees to accept their part of the cargo at any suitable place of delivery, without delay, as soon as the condition of the ship in reference to the rest of the cargo would permit their part to be delivered. They were not obliged to take the rails until they could be delivered by the ship, and then they were bound to take them without delay.

The place of delivery seems to have been selected by the master or by the ship's agent. It was not a suitable place, because the owners of the Atlantic docks did not permit rails to be landed on their dock, and would not allow these rails to be landed there. The respondents, as owners of a part only of the cargo, had no right to control the selection of the place of delivery. They had stipulated to accept their rails at the place where the rest of the cargo should be delivered. The

charterers did not assume to select the place of delivery, nor did the other consignees. The case is like one where a general ship under-takes a delivery to several consignees of their respective parts of the cargo. It is doubtful in such a case whether the consignees jointly have any any right to select the place of delivery. In *The E. H. Fittler*, 1 Low. 114, it was held that they have such a right when they are unanimous; but the question was decided upon the usage of the port. Where there are several consignees the master cannot con-veniently consult them, and certainly, unless they unite in the selec-tion of the place of delivery, his duty is satisfied by a delivery at a place suitable and reasonably convenient for all, under the special circumstances. His contract is fulfilled by delivery from the ship at a proper place within the port. If he does not deliver to the con-signee personally, he must justify his substituted delivery by showing that it was in accordance with the terms of his contract or with the usage of the port or with the course of business between the parties. *Gatliffe* v. *Bourne*, 4 Bing. N. C. 314; 3 Man. & G. 642; 7 Man. & G. 850; *Humphreys* v. *Reed*, 6 Whart. 435; *Hemphill* v. *Chenie*, 6 Watts & S. 62; *Ostrander* v. *Brown*, 15 Johns. 39.

The respondents are not liable because they failed to select a place to receive their cargo, when they had no power of selection. The libelant was not obliged to await their action. He cannot hold them responsible for a delay which would not have injured him, and would not have occurred if he had performed his own duty. They under-took that there should be no delay in the delivery of the cargo on their part, but they did not undertake to assume liability for his delay, or for his failure to offer a suitable delivery to them.

If the respondents had assumed to direct a delivery upon the lighter, or had promised unqualifiedly to provide a lighter for the re-ception of their rails, a foundation for the claim for demurrage would be established. But they stated to the vessel agent that they would send a lighter if they could get a permit. It is true, the captain of the lighter informed the libelant that he would be ready to receive the rails when the ship was ready to discharge them; but when that time came he informed the mate, who was then in charge of the vessel, that he could not get permission of the customs authorities to take them unless they could be weighed on the deck of the vessel. No de-lay ensued in consequence of his promise to take them. As it was understood from the outset that acceptance of delivery upon the lighter was conditional upon the consent of the customs authorities, it was incumbent upon the libelant to consent when requested, or to treat the negotiations as ended, and select his own place of delivery. The respondents held out no inducements for further delay, and in the absence of any circumstances relieving the libelants of the duty of procuring a suitable place to discharge the rails, or showing his inabil-ity to do so, he has no reason to complain of the delay.

The decree of the district court is affirmed, with costs.