HATTON *v.* DE BELAUNZARAN and others.[1]

*(District Court, S. D. New York.* March 10, 1885.)

**CHARTER-PARTY—DEMURRAGE—CESSER OF LIABILITY—DIFFERENCE OF FREIGHT —NOTICE TO AGENT—NO AGENT PRESENT—ADVERTISING.**

The charter of the bark Peeress was in substance similar to that in the case of *Eisenhauer* v. *Belaunzaran, post,* 784. The vessel sailed from New York to Cadiz, where a recharter was executed to F. & Co. to carry a cargo of salt to Bahia, Brazil. The original charter provided that "lay days shall commence after the vessel is ready to discharge, and written notice thereof is given to the party of the second part or agent." Upon the "provisional settlement" at Cadiz, the captain executed his note to the Cassa Marittima for the difference of freight, payable absolutely after his arrival at Bahia, with a pledge of the ship and freight therefor. The vessel arrived March 4th, consigned to the "agents" of the recharterers. There were not then any agents of F. & Co. at Bahia, through delay in sending instructions in regard to this cargo; nor were there present any agents of the respondents in reference to this ship or cargo. Certain representatives of the respondents refused to have anything to do with it. Written notice of the vessel's readiness to discharge could not therefore be given to any authorized "agent" until some time after, when C. & Co. received cabled instructions from respondents and from F. & Co., and assumed the agency. Upon delivery of cargo there was no shortage, and the "estimated" freight was collected in full. The cargo at Bahia was worth no more than the freight, and the consignees therefore refused to pay any demurrage, though that was a lien on the cargo; and the cargo was therefore delivered on payment of the freight only. The note was paid in full from the freight collected, and the rest of the freight was applied in payment of the charter money. This suit was brought against the original charterers for the demurrage. *Held,* (1) that, although the note given was in form in excess of the master's authority, yet as the estimated freight was fully realized, the note truly represented F. & Co.'s share of the freight money received at Bahia: that as the recharter provided that "charterer's liability should cease on cargo's being shipped," and as this was the form of recharter that respondents had required the master to sign, respondents had in effect agreed that F. & Co. should not be personally held for demurrage at Bahia; that the master had no right, therefore, to deduct the demurrage claim as a set-off against the amount of the note, which truly represented F. & Co.'s share of the freight collected; that the demurrage was no lien on the freight, and hence the master did the respondents no legal wrong in paying the note in full. *Held,* (2) that as the recharter which the captain was required to sign expressly provided that the vessel should be loaded with salt, the captain could not be charged with fault in taking a cargo of less value than the freight and demurrage; and, as he secured the full value of the cargo, he could do nothing better

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

for the respondents, and was in no fault for delivering it upon payment of its full value as freight.   *Held*, (3) that respondents, to entitle themselves to the benefit of the provision for "written notice" of discharge under their original charter, were bound to have an agent at Bahia, ready and authorized to receive such a notice.   Not having any such agent there, they were liable for the vessel's demurrage from the time of her actual readiness, and damages for 12 days were allowed, as well as the moneys paid by the master for advertising for charterer's agent, and for cabling to New York.

In Admiralty.

*Wilcox, Adams & Macklin*, for libelant.

*Olin, Rives & Montgomery*, for respondents.

BROWN, J.   The claim in this case is for demurrage for the detention of the British brig Peeress, at Bahia, Brazil, in the discharge of a cargo of salt shipped at Cadiz by Florez & Co., under a recharter, dated Cadiz, January 13, 1885.   The vessel had been originally chartered by the respondents at New York, on the fourteenth day of October, 1884, for a voyage to Gibraltar and thence to Brazil, with the privilege of rechartering.   The terms of the original charter and of the recharter were in substance identical with those in the *Case of Eisenhauer, post*, 784.   Upon the "provisional settlement" of freight with Florez & Co., at Cadiz, the captain executed to the Cassa Marittima his note for £210 13s. 9d., containing similar provisions with those in the case cited, and he received a similar agreement from Florez & Co.   On arrival at Bahia, about the first of March, 1885, there was delay in finding the consignees.   The draft was paid in full before the complete discharge of the vessel.   There was no shortage in delivery, but the lay days being exceeded, the captain became entitled to demurrage, under the original charter as well as under the recharter, at the rate of $30 per day.   I am satisfied from the evidence that the salt was worth nothing above the freight and charges, and that the claim for demurrage could not have been collected out of the cargo, besides freight.   The master was unable, therefore, to collect any claim for demurrage, although that claim was made a lien on the cargo, both by the original charter, and by the recharter to Florez & Co.   He was able to collect from the cargo the freight stipulated in the original charter and in the recharter, but nothing more.   As there was no shortage on delivery, the amount of freight collected was precisely that estimated in the provisional settlement, and was just sufficient to pay the note that he had given on Florez & Co.'s account, together with the balance of the original charter money due to the vessel, and applicable to the respondents' credit on that account and no more.   The note was paid in full.   If the master, under the circumstances, had any right to deduct the claim for demurrage accruing at Bahia out of that part of the freight collected there and applicable to Florez & Co.'s account, then his payment of the note in full, leaving his own claim for demurrage unpaid, upon the principles of the *Case of Eisenhauer, supra,*

was a payment in his own wrong, and in violation of his duty to the original charterers, which would afford them a defense against the present claim.

By the terms of the recharter, however, to Florez & Co., they were not personally answerable for any demurrage at Bahia, because the recharter provided, "The charterer's liability to cease on the cargo's being shipped." *Sanguinetti* v. *Pacific Steam Nav. Co.*, 2 Q. B. Div. 238, 247. This was the form of the recharter that the original charterers required the master to sign at Cadiz. The respondents, therefore, in effect, agreed that Florez & Co. were not to be personally liable for demurrage at Bahia; but that the consignees at Bahia, or the cargo only, should be looked to for that claim. The freight collected at Bahia, less the last installment of the charter money payable there, belonged, however, to the recharterers. The balance of the charter money was paid in full out of the freight collected; and the respondents, as the original charterers, had no claim or lien upon the rest of the freight money going to Florez & Co.'s account, in respect to demurrage accruing at Bahia, because Florez & Co. were, by the recharter, absolved from liability for that demurrage. The only mode of enforcing the claim for demurrage was, therefore, either by the ship's lien upon the cargo, or by a personal demand against the consignees. But the lien on the cargo was worthless because the freight amounted to its full value; and the consignees were willing to pay, and offered to pay, the freight, but would not pay the demurrage. If there had been anything more or better that the captain could have done for the interests of the owners and of the respondents than to deliver the cargo upon payment of the freight alone, it would have been his duty to do so; but, as he secured the full value of the goods, clearly he could do nothing more and nothing better, and he is therefore in no fault. As the demurrage claimed, moreover, was not a lien on that part of the freight collected which belonged to Florez & Co., but only upon the cargo, and could not be charged against Florez & Co. personally, the demurrage claim could not be lawfully deducted from the note, or from the amount of freight belonging to Florez & Co. Though the note given was in form in excess of the master's authority, the respondents were not thereby injured; because, as it turned out, it represented only what belonged, under the recharter, to Florez & Co,

The real trouble in this case arose from the fact that the cargo taken aboard at Cadiz was not worth enough, on arrival at Bahia, to pay the claim that arose for demurrage, in addition to the freight, and that the recharterers were released from personal liability for the demurrage claim. As the recharter, which the respondents required the master to sign, expressly provided that she should be loaded with salt, the captain cannot be charged with any fault for taking a cargo worth less than both these claims; and the respondents, therefore, took the risk of the master's ability to satisfy any claims that might

arise for demurrage, out of the cargo. In most English charters that contain the cesser of liability clause, that clause is now conditioned upon the cargo's being of sufficient value to pay the demands upon it. Whatever may be the personal claim that the master or owners might have had upon the consignees or on Florez & Co., the respondents have the same rights. This does not affect the libelant's right to sue on the obligations of the original charter.

The vessel was ready to discharge at Bahia on Thursday, March 4th. Under the recharter her remaining 24 lay days would count from that day. The original charter, however, provided that the lay days for discharge should commence "from the time the vessel is ready to discharge cargo, and written notice thereof is given to the party of the second part or agent." By the recharter the ship was to be "addressed to charterer's agents at port of discharge;" *i. e.*, to the agents of Florez & Co. at Bahia. The captain saw Solomon Carvalho, who was the agent of Florez & Co. for some purposes, on the second of March, and frequently after that date; but he told the captain that he knew nothing about this cargo, and could do nothing about it. It was not until after the 10th, when the captain cabled to New York, that directions from the respondents were received by Mr. Carvalho to take charge of the Peeress, and at about the same time similar directions were received from Florez & Co. at Cadiz.

If the provision of the original charter requiring written notice of readiness to discharge was applicable at Bahia in the absence of any similar provisions in the recharter, the evidence shows that there was no agent, either of the respondents or of Florez & Co., authorized to act in behalf of either of them, at Bahia, at the time when the ship was ready to discharge, and when the captain endeavored to give the notice required. The absence of written notice cannot, therefore, avail the respondents, because both they and the recharterers were chargeable with negligence for having no agents there to whom such notice could be given. The respondents are liable, therefore, for delay in discharging after March 4th, deducting 24 lay days. As the vessel was not discharged until the 13th, the delay was 12 days, which, at $30 a day, amounts to $360. The libelant is also entitled to the additional charge of $36.88 for cabling from Bahia, and for the advertising rendered necessary from the absence of any agent there to attend to the ship or cargo.

A decree may be entered for $396.88, with interest from April 13, 1885, and costs.