THE GULNARE.[1]

MACHECA and others *v.* THE GULNARE.[1]

*(Circuit Court, E. D. Louisiana. June 27, 1885.)*

MASTER—AUTHORITY OF.
    "The master of the ship is the confidential servant or agent of the owners, and they are bound to the performance of all the lawful contracts made by him relative to the usual employment of the ship, and the repairs and other necessaries furnished for her use. *The Aurora,* 1 Wheat. 102.

Admiralty Appeal. Libel on a draft for supplies furnished in foreign port.

*Geo. H. Braughn, Chas. F. Buck, Max Dinklespeil,* and *J. Ward Gurley, Jr.,* for libelants.

*B. F. Jonas* and *J. O. Nixon, Jr.,* for claimants.

PARDEE, J. In February, 1884, the steam-ship Gulnare, D. W. C. Kells, master, cruising in Caribbean sea, looking for a cargo of fruit, entered the port of Livingston, Guatemala, in need of fuel. There was no coal market, nor supply of coal, nor coal dealer, in that port. All the coal in port belonged to Anderson & Owen, who had just received about 15 tons by steamer from England, for their own use in supplying a small steamer run by them up the river in that country. According to the statement of the master, he applied to Anderson & Owen to supply him with coal, which, after repeated solicitations and a great deal of talk, and as a personal favor to him, they agreed to

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

do to the extent of the 15 tons aforesaid, on consideration that he would give a bond to return the same amount of coal on the return of the steamer, or on the next steamer of the Macheca line visiting that port.

The bond was to consist of a draft on the ship's agents at New Orleans for $300, which would be $20 per ton for the coal, which draft would be considered canceled when the coal was returned.    The draft was not considered as fixing the price of the coal; it was merely a bond to secure the return of the coal.    The statement of Mr. Anderson agrees substantially with that of the master.    He says:

"We told him (the master) that we were not in immediate need of it, and that if he would guaranty to return it by the next trip of the Ella Knight, or by the next steamer of the Macheca line, he could have it, and we would charge him nothing for it.    We simply required him to replace the coal.    He said all right, he would return it.    We told him that in the event of the coal not being returned it would put us to inconvenience, because we needed it to mix with our wood.    We told him the coal was worth to us twenty dollars a ton,—three hundred dollars,—and he agreed to give us a draft on his agents, Woodward & Wight, for the value of the coal at twenty dollars a ton, and if they returned the coal the draft was to be considered canceled.    That was the verbal agreement we had with Capt. Kells.    They didn't return the coal, and when we forwarded the draft they declined to pay it."

The coal was furnished, and the draft now sued on was given.    It seems by the testimony of Anderson that the draft was not to be sent on for collection, but was to be retained to give an opportunity to return the coal.    After waiting about 90 days the draft was sent on here for collection.    The payment of the draft being refused, the present suit was brought to recover the full amount of the draft.    The evidence is conflicting as to whether the master of the Gulnare, on reaching the port of New Orleans, notified the owners and agents of the Gulnare of the contract as to the return of the coal and the drawing of the draft, but the weight of the evidence is that such notice was given, and that thereafter, and before the draft was forwarded for collection, there was ample time to have returned the coal according to the contract.

It seems that after the draft was received at New Orleans for collection that the agents of the Gulnare offered the attorneys holding the draft to settle by returning the coal, or by paying therefor at the rate of $12 per ton, but neither was done.    After suit was commenced, however, the agents of the Gulnare paid and tendered in court $180, with interest from February, 1884, as full compensation and payment for the coal, being at the rate of $12 per ton.    There is no doubt that the master had the authority to make the contract as it is shown to be by the evidence in this case.

"The master of the ship is the confidential servant or agent of the owners, and they are bound to the performance of all the lawful contracts made by him relative to the usual employment of the ship, and the repairs and other necessaries furnished for her use."    *The Aurora,* 1 Wheat. 102.

There is no suggestion that the contract in this case was unlawful.

"The owner is personally responsible for all the obligations which the master, within the scope of his authority as master, incurs to their full extent, whether arising *ex contractu* or *ex delicto*, and it is not known that any other than a special statute limitation, which marks what the general rule is, has ever been introduced into this country by way of usage or otherwise." Curtis, Mer. Seam. 199, and note citing cases.

"Every contract of the master for repairs and supplies in a foreign port imports an hypothecation." Id. 200, and cases cited.

As the contract was lawful, and is binding on the ship and owners, I see no good reason for not enforcing it. The claimants urge that the master never notified them in time so that they could return the coal. The master swears he did; but it is immaterial. It was the master's duty to have informed them, but Anderson & Owen are not responsible for his neglect of duty. If the master had dumped the coal in the port of Livingston it would not affect the libelants' rights. It is also urged that the draft was withheld and not presented in time for them to comply, and that they were not in default until the draft was presented. The proof is that the agreement was that the draft should be withheld to give time to return the coal. It is urged that the price of $20 per ton is exorbitant, and that coal, in the port of Livingston, was not worth at the outside over $12 per ton. The evidence supports the claim as to the actual merchantable value of the coal in the port of Livingston; and this makes it clear that the Gulnare's owners and agents ought, in their own interest, to have taken the option given them by the contract, and have returned the coal in kind.

The case shows that the claimants neither returned the coal nor paid, but compelled Anderson & Owen, who, all through the case, appear to have acted in a generous and friendly spirit towards the ship and owners, to follow the ship to this country and involve themselves in expense and litigation to secure the return of their own. The kind of favor that was shown the Gulnare in her necessity should be encouraged and rewarded in a court of admiralty. If Anderson & Owen had been coal dealers, or had sought to take advantage of the Gulnare's necessities, or had even furnished the coal for chance of gain, there might be some reason in applying technical rules to defeat their demand; but, as the case is, I am clear that they are entitled to the full amount of the draft sued on.

Let a decree be entered for libelants for $300, and all costs against the claimants and their sureties on the release bond.