BURRILL et al. v. CROSSMAN et al.

(District Court, S. D. New York. November 28, 1894.)

1. CHARTER PARTY—DEMURRAGE—CESSER CLAUSE.
   The charter party of the bark K. B. provided that her cargo of lumber should be discharged at Rio at the rate of 20,000 feet per day; that the master should sign bills of lading as presented by the charterer; vessel to have a lien on the cargo for all freight and demurrage; and charterer's responsibility to cease when vessel is loaded and bills of lading signed. The lumber was shipped, and a bill of lading presented by the charterer, and signed by the master, deliverable to order, "freight payable as per charter," but without any other reference to the charter party. Delay in discharging having arisen at Rio, through actual naval warfare in the Bay of Rio, *held*: (1) That under the contradictory provisions of the charter party, the charterer was not entitled to exemption from liability under the cesser clause where he had presented for' signature a bill of lading which, contrary to the provisions of the charter, did not give the ship a lien on the cargo for the charter demurrage; (2) that the reference in the bill of lading, "freight as per charter party," did not impose on the consignee the duty of paying charter demurrage, without reference to any fault in the consignee; and that the charterer, therefore, remained liable for demurrage, if any, due under the charter provisions.

2. SAME—WARFARE AT PORT OF DISCHARGE—NO SAFE ANCHORAGE—TO DISCHARGE AND RECEIVE, CONCURRENT DUTIES—SHIP'S INABILITY TO DISCHARGE—SETTLEMENT BY MASTER VALID.
   The charterer, being required "to designate a safe anchorage ground at Rio," and "to discharge at the rate of 20,000 feet of lumber per day, or pay demurrage on default," pleaded that it was impossible to remove the cargo sooner than was done, by reason of naval warfare in Rio Bay, and a subsequent adjustment with the master at Rio, and payment and satisfaction of all claims. *Held*, on exceptions, that this plea was a complete defense; that the duty of the ship to discharge and of the consignee to receive were concurrent duties; that the answer of "impossibility to remove the cargo" included impossibility of the ship to perform her duty to discharge, which precluded any right to recover demurrage

while that impossibility continued; that the duty of the charterer to designate a safe anchorage ground, no time being named, was to be performed within a reasonable time, according to the circumstances; and that the major force of naval warfare was a valid excuse for the delay in designating a safe place of discharge; and that no "default" appeared for which demurrage could be claimed.

### On Further Hearing.

SAME—NAVAL OPERATIONS—MAJOR FORCE—"DEFAULT" IN UNLOADING.

Where the charter contained no definite number of lay days for unloading, but provided for discharge at the rate of 20,000 feet of lumber per day from the time the vessel was ready to discharge, with $59.46 demurrage for each day of detention by "default of the charterer," and the answer alleged naval operations in the port of discharge in consequence of which it was "impossible to remove the cargo from the vessel sooner than it was removed": *Held* (1) upon exceptions, that the duty of the ship to deliver, and the charterer to receive, were concurrent duties, both of which were included in the "removal" of the cargo from the ship, and that there was no "default" on the part of the charterers so as to incur demurrage during the time that the ship by reason of such naval operations was unable to deliver; (2) that the determination of facts in regard to such obstacles in delivery in a distant port were peculiarly within the province of the master or the ship's local agent, and that a settlement by them in respect to any claim for demurrage dependent on such facts was presumptively valid and conclusive; (3) that it having been admitted on the argument of exceptions that the facts were substantially as pleaded in the answer, and the cause having been submitted for decision, and decided thereon, no amendment of the libel should be allowed in order "to confess, avoid, or explain," under the fifty-first rule in admiralty, where the application therefor showed no mistake, nor any facts incompatible with the legal effect of the facts stated in the answer.

This was a libel by William Burrill and others against William H. Crossman and others to enforce a lien for demurrage. The case was heard as to the effect of a clause in the bill of lading providing that the charterers' responsibility should cease upon the loading of the vessel and the signing of the bills of lading; also upon exceptions to the rest of the answer, as constituting an insufficient defense.

George A. Black, for libelants.
Wheeler & Cortis, for respondents.

BROWN, District Judge. The above libel was filed to recover for 53 days' demurrage, for the detention of the bark Kate Burrill, at Rio de Janeiro in the unloading of a cargo of lumber at the stipulated charter rate of $59.46 per day. The respondents in their charter of the vessel from the libelants had stipulated that the vessel should—

"Be discharged at the rate of 20,000 feet per day, lay days to commence from the time the vessel was ready to discharge cargo, and written notice thereof given to the libelants or their agent; and that for each day of detention by default of said parties of the second part or their agent $59.46 should be paid; vessel to discharge at safe anchorage ground in Rio Bay, designated by charterers or their agent."

The charter contained the further stipulations:

"Vessel to have an absolute lien on the cargo for all freight, dead freight, and demurrage; charterers' responsibility to cease when the vessel is loaded

and bills of lading are signed; bills of lading to be signed as presented without prejudice to this charter; the vessel to be consigned to charterers' agents at port of discharge."

The answer alleged that the lumber was shipped to the libelants' vendees in Rio under a bill of lading to order, which was indorsed to the vendees of the timber, and by the latter again indorsed to subvendees before the arrival of the bark; that the delay was caused wholly by the acts of public enemies at Rio, to wit, certain vessels of war which were then in the harbor and making war upon the government of Brazil; and that the firing between said vessels of war and the said forts made it impossible to remove the said cargo from the said vessel any sooner than it was removed. And further, that the captain of the vessel and the agent of the libelants acquiesced in the delay and recognized the necessity therefor; and when said cargo was delivered, accepted and received by the vendees, the sum of £515. 6s. 5d. was accepted in full satisfaction and payment of all claims under the charter party. The respondents further claim that they were relieved from all liability by the cesser clause of the charter above quoted.

For the convenience of the parties, and to save the expense and delay of a commission to Brazil to take proof of the facts pertaining to the other defenses, the cause was brought to trial as to the effect of the cesser clause above quoted.

The provisions of the charter party are in form contradictory. One clause declares that for every detention by default in receiving or discharging the cargo by said parties of the second part, or agent (the respondents), the demurrage, as above specified, shall be paid by them. The other clause declares that their responsibility shall cease when the vessel is loaded, and bills of lading are signed. A previous clause also provided that the cargo should be discharged at the port of destination at the rate of 20,000 per day.

The general intent of these provisions taken together manifestly is, that the ship shall be paid, not only freight, but demurrage for detention beyond the stipulated time in discharging. The various clauses of the charter in this regard should be interpreted consistently, so far as possible, with this general purpose, as well as with its further presumed purpose to relieve the charterer from the responsibilities attending a discharge of cargo to purchasers in distant ports, where the ship by means of the other provisions of the charter, having secured to her a lien upon the cargo for both freight and demurrage, has it in her power to enforce payment of her claims by means of that lien, without a resort to the charterers at the port of loading. In the cases of Clink v. Radford [1891] 1 Q. B. 625, and Hansen v. Harrold [1894] 1 Q. B. 612, the relation of these clauses to each other has been recently carefully considered in the English court of appeal, and the rule laid down is, that these different clauses are to be applied and construed with reference to each other, and to the purposes above stated; and that where "the provision for a cesser of liability is accompanied by the stipulation as to a lien, then the cesser of liability is not to apply in so far as the lien, which by the

charter party the charterers are enabled to create, is not equivalent to the liability of the charterers"; and that "where the provisions of the charter party enable the charterers to make such terms with the shippers that the lien which is created is not commensurate with the liability of the charterers under the charter party, then the cesser clause will only apply so far as the lien which can be exercised by the shipowner is commensurate with such liability."

This is substantially the construction that was given by this court to the cesser clause in the case of Hatton v. The Belaunzaran, 26 Fed. 780; where notwithstanding the cesser clause, the charterer was held liable to pay demurrage, because under the right to effect a subcharter, he had required the ship to take a cargo of salt not of sufficient value at the port of discharge to pay anything more than the freight stipulated for in the subcharter.

In the present case the respondents, as charterers, had the right to require the master to sign bills of lading as presented, without prejudice to the charter. This does not mean that the bill of lading itself, or the consignee under it, should be subject to all the obligations of the charter; it means only that the charterers' obligations to the ship and owners should not be affected by the terms of the bill of lading thus signed on the charterers' requirement. Gledstanes v. Allen, 12 C. B. 202.

The bill of lading for the lumber in question provided for "paying freight for said lumber as per charter party dated 7th March, 1893, and average accustomed." A bill of lading in this form imposed upon the indorsee of the bill of lading who received the goods under it none of the stipulations of the charter except such as pertained to the payment of freight. Chappel v. Comfort, 10 C. B. (N. S.) 802; Smith v. Sieveking, 4 El. & Bl. 945; Fry v. Bank, L. R. 1 C. P. 689; Dayton v. Parke, 142 N. Y. 391, 400, 37 N. E. 642. It was no notice to him of any other provisions of the charter, such as that he must discharge a certain quantity of lumber per day, or in default thereof pay a specified price per day for any further detention of the vessel. Under this bill of lading, the vendee was entitled to take the goods within a reasonable time, according to the circumstances on arrival, and under the ordinary rules of law as to liability to damages for detention, such as apply in the absence of any specific agreement. This is a very different liability from that of a specific agreement that assumes all risks of detention from whatever cause, and agrees upon a specified rate of damages.

Had the bill of lading provided for the payment of freight and "all other conditions as per charter party", the latter provision would have been construed ejusdem generis as imposing upon the consignee the payment of something more than freight, and would have included the obligations referred to in the charter party respecting the rate of delivery, and the payment of the demurrage specified; though not necessarily including independent provisions of the charter party relating to different subjects. Russell v. Niemann, 17 C. B. (N. S.) 163; Serraino v. Campbell, 25 Q. B. Div. 501, [1891] 1 Q. B. Div. 283; Wegener v. Smith, 15 C. B. 285; Porteus v. Watney, 3 Q. B. Div. 534.

What the respondents, therefore, in this case virtually required the master to do was, to give a bill of lading for this lumber that required the master to deliver it to the indorsee of the bill of lading, without the payment of any charter demurrage at all, such as the respondents had agreed should be paid; but which bound the consignee to pay for such demurrage only as might arise through his own fault. Whether this was done inadvertently, or by design, is immaterial as respects the ship. For the ship could only claim of the vendee according to the bill of lading. The bill of lading required the ship to deliver the cargo contrary to that provision of the charter which provided that the ship should have a lien on the cargo for the charter demurrage. The cesser clause, and the lien clauses, were dependent provisions; each was a consideration for the other; and when the charterers required the ship to forego the benefit of her lien on the cargo for the charter demurrage by presenting, and taking from the master, under the bill of lading clause in the charter, a bill of lading which did not admit of a lien for charter demurrage on this cargo, the charterers could not claim the benefit of the cesser clause as a release of the previous general clause of the charter which made them answerable for demurrage. The decisions above quoted sustain this construction, which will be followed by me, as a just and reasonable construction of these several clauses. The cesser clause, therefore, is not a sufficient defense.

---

### On Further Hearing.

(December 17, 1894.)

BROWN, District Judge. The exceptions to the other parts of the answer must be overruled. The facts stated in the answer, the truth of which must be accepted on this argument, amount, in my judgment, to a complete defense. As respects the lay days, the charter provided:

"Lay days to commence from the time the vessel is ready to receive or discharge cargo, and written notice thereof is given to the party of the second part, or agent; and for each and every day's detention or default of the said party of the second part, or agent, $59.46 shall be paid; * * * vessel to discharge at safe anchorage ground in Rio Bay designated by charterers."

The charter does not fix a definite time from which the lay days are to be computed in any other way than from the time that the ship is "ready to discharge and gives notice thereof." The libel states that the ship arrived at Rio on the 30th of August, and that on the 4th of September, 1893, "notice that she was ready to discharge was duly given," etc.

The answer states, that "by reason of the acts of public enemies, to wit, certain vessels of war which were then in the harbor of Rio de Janeiro, and were engaged in firing upon the forts and making war against Brazil, they were prevented from removing the cargo any sooner than they did"; and that "the firing between said vessels of war and the forts made it impossible to remove the cargo

from the said vessel any sooner than it was removed"; and that after the discharge, the agent of the libelants, and the consignees made a settlement in full satisfaction of all claims under the charter party, and the balance found due was paid.

The substance of this defense is that by reason of the public enemy and actual warfare in Rio Bay, it was "impossible to remove the cargo from the vessel" sooner than was done. It was the vessel's duty "to remove the cargo from the vessel"; for that is the act of discharge; and it was the consignee's duty to receive it as removed; in this case at the rate of 20,000 feet per day. The ship's duty to remove and discharge the cargo, and the consignee's duty to receive, are concurrent duties; and where performance by either is prevented by major force, neither is in "default" unless that risk has been assumed by the charterer or consignee under the contract, which is not the case here. Ford v. Cotesworth, L. R. 4 Q. B. 127; L. R. 6 Q. B. 544; Kay v. Field, 10 Q. B. Div. 241; Dahl v. Nelson, 6 App. Cas. 38; Carsanego v. Wheeler, 16 Fed. 248; The Spartan, 25 Fed. 44, 51.

This case is quite different from those in which a charterer has contracted to discharge the cargo within a certain time after "arrival," and thereby takes all risks of delay. Under this contract, (1) the charterer was to designate a safe anchorage ground for discharging in Rio Bay, and (2) the vessel was to get in readiness to discharge, and then to give notice thereof, before the lay days would begin. The vessel was not bound to undertake a discharge at an unsafe place; nor was the charterer required to receive the cargo at an unsafe place, nor outside of Rio Bay. No time being stipulated within which the charterer should designate a safe place of discharge, he was bound to do this within a reasonable time, according to all the circumstances. Henley v. Ice Co., 14 Blatchf. 522, Fed. Cas. No. 6,364; Fish v. 150 Tons of Brown Stone, 20 Fed. 201, and cases there cited; Paquette v. Cargo of Lumber, 23 Fed. 301; The Spartan, supra. The answer, in effect, alleges that this was done as soon as possible.

The libel does not allege that the vessel was actually ready to discharge at any time before the discharge actually began. It only asserts that notice of readiness was given. That is a very different thing. Such notices are often given by shipmasters in the attempt to set demurrage running, before the ship is ready or able to perform her obligation to discharge. Carsanego v. Wheeler, supra; Teilman v. Plock, 17 Fed. 268, affirmed 21 Fed. 349.

The plea of accord and satisfaction is also a sufficient defense. Questions of safety of the vessel in discharging, of actual ability and readiness to deliver, dependent on the circumstances existing at a distant port, are peculiarly within the province of the master, or the ship's local agent, to consider and to determine in their relations to such a question as that of demurrage; and a settlement by either with the charterer or consignee is presumptively valid and conclusive, and should only be set aside upon such special proofs as in equity would invalidate settlements with the principal, nothing of

which here appears.   Alexander v. Dowie, 1 Hurl. & N. 152;   The Gulnare, 24 Fed. 487.

The exceptions are, therefore, overruled.

---

### Motion to Amend Libel.

(December 31, 1894.)

BROWN, District Judge.   This case has been twice heard upon exceptions by the libelants to the answer, upon the understanding— at least on the part of the court—that the hearing was to be treated as a trial of the cause, upon the admission of libelants' counsel in open court that the facts were correctly stated in the answer; this course being adopted in order to avoid the expense and delay of a commission to Brazil, in case the facts alleged in the answer should be held to constitute a legal defense.   Two opinions have been delivered by the court after these hearings.   The lattter being adverse to the libelants, their proctor now moves for leave to withdraw the exceptions, and to amend their libel "so as to confess and avoid, explain and add to, the new matter set forth in the answer."   This, if allowed, would involve quite a substantial departure from the understanding had, at least by the court, in the previous proceedings, which would have been quite different had it been considered that any such application as the present was to be subsequently made.

The only misunderstanding now alleged by the libelants' proctor I understand to be as to the scope of the words in the answer, "impossible to remove the cargo"; but on the argument and before submission, the court stated that "removal" included delivery by the ship as well as receipt by the consignee.

The last hearing was upon the admission of counsel in open court that the facts were stated with substantial correctness in the answer; viz., that naval warfare in the harbor of Rio "made it impossible to remove the cargo sooner," which the court held to be a major force, under which the consignee or charterer was not in "default"; and further, that the facts respecting such warfare, and the extent of its interference with the vessel's discharge in a distant port were specially within the scope of the master's authority to appreciate and determine, as the representative of the shipowners; and that any settlement made by him in satisfaction of freight and demurrage, or of "all claims," as alleged in the answer, was within his lawful power, and was binding upon the libelants.

The application to confess and avoid, does not set up any facts inconsistent with what was admitted on the previous hearings, and stated in the answer.   The affidavit does show that a safe place was at first designated, and the discharge begun; but that the discharge, after it was commenced, was suspended at different times for upward of 53 days, the delay claimed in the libel; and the affidavit does not affirm or suggest that this suspension was not caused solely by the naval hostilities stated in the answer, or that suspension was not the necessary result of those hostilities.   The affidavit, there-

fore, inferentially confirms the answer to this extent and the admission made on the argument. The forced interruption of the ship's power to deliver, where no time has been agreed on, stops demurrage, as much as her inability to begin would stop it. It is a case of a concurrent duty in the ship to deliver, because the charterer here did not contract to assume the risk of her inability to deliver 20,000 feet per day; and whenever she was unable to do that, no matter what the cause, she could not claim demurrage. Ford v. Cotesworth, L. R. 4 Q. B. 127; Riley v. Cargo Iron Pipes, 40 Fed. 605; The J. E. Owen, 54 Fed. 185.

The application further states an "intent to allege" that the sum paid was only the amount of the freight due; and to deny the authority of the master, or of Phipps Bros. & Co., agents, to receive that sum in full satisfaction of all claims and demands, and also to deny that they had any authority to make or state an account respecting all claims under the charter party. The denial of the master's authority is a mere question of law. The affidavit does not state that the amount paid at Rio was not there paid and received or intended as a settlement of all claims for freight or demurrage.

The libelant's counsel claims an absolute right under the fifty-first rule of the supreme court in admiralty to amend the libel in order to confess, avoid and explain as above stated. Though such an amendment would undoubtedly be allowed if applied for at a proper time. no such right exists after the parties have proceeded to a hearing upon the pleadings; nor if it did, could it be allowed upon the mere affidavit of the proctor, as in this case, as to what the libelants "intend to allege," where no fact is set forth in the application incompatible with the allegations of the answer, or avoiding their legal effect. As respects mere denials of such allegations, no such amendment is necessary.

The application is, therefore, denied.