## BURRILL et al. v. CROSSMAN et al.

(Circuit Court of Appeals, Second Circuit. July 30, 1895.)

**1. SHIPPING—CHARTER PARTY—CESSER OF CHARTERER'S LIABILITY.**

A charter party provided that the vessel should be discharged at a specified rate per day; that for each day of detention a specified demurrage should be paid; that bills of lading should be signed as presented, without prejudice to the charter; that the vessel should have an absolute lien upon the cargo for freight and demurrage; and that the charterers' liability should cease when the vessel was loaded, and bills of lading signed. The charterers presented, and the master signed, bills of lading providing for paying freight, but making no reference to the provisions of the charter in regard to demurrage, and these bills were at once transferred. The discharge of the cargo was delayed, without fault of the consignees, and the owners filed a libel against the charterers for the stipulated demurrage. *Held,* that the provision in the charter for cesser of the charterers' liability applied only so far as the lien provided by the charter was commensurate with the charterers' original liability, and they, having, under the clause providing for signing bills of lading, presented bills which imposed no liability on the transferees for the demurrage stipulated in the charter, remained liable to the owners for such demurrage.

**2. SAME—DEMURRAGE—FIXED TIME FOR DISCHARGE.**

*Held,* further, that, by stipulating the rate of discharge, having fixed definitely the time for its completion, the charterers were liable for delay beyond that time, though caused by the acts of the public enemy, and without fault of the charterers or consignees.

**3. SAME.**

Where the charter party provides that demurrage should be payable "for each day of detention by default of the charterers or their agents," the word "default" means an omission or neglect to perform the contract.

**4. ADMIRALTY—PLEADING—DENIAL OF ANTICIPATORY AVERMENT.**

A denial in the answer of an anticipatory averment in the libel, that the agents of the libelants were without authority to make a certain agreement, is equivalent to an averment that they had such authority, and raises an issue as to its existence.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by William Burrill and others, owners of the bark Kate Burrill, against William H. Crossman and others, to recover demurrage under a charter party. Libelants appeal.

Geo. A. Black, for appellants.

Wheeler & Cortis, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge.  Leave was granted to the appellants by this court to make new allegations in their libel, and, the appellees having answered, the appellants have filed exceptions to several of the articles of the answer, upon the ground that the same are insufficient, in law, to constitute a defense.  While there is no formal rule which sanctions this practice, the rules for appeals in admiralty only permitting new allegations in pleading and new proof, and while there are objections to a practice which may require an appellate. tribunal to decide a cause in fragments, inasmuch as no objection has been made on the part of the appellees, and the exceptions raise important questions of law, the determination of which may relieve the parties from the delay and expense of introducing the proofs, we proceed to examine the exceptions, but without intending to commit the court, when the question may hereafter arise, as to the propriety of the practice.  We shall not, however, consider the first exception, which relates merely to a matter of form, and does not involve substance.

The libel was filed by the owners of the bark Kate Burrill to recover of the charterers 53 days' demurrage for her detention at Rio de Janeiro in unloading a cargo of lumber.  The charter party was for a voyage from Pensacola, Fla., to Rio de Janeiro, Brazil. It provided that the vessel should be consigned to charterers' agents at port of discharge, and be discharged at the rate of 20,000 feet (of lumber) per day,—lay days to commence from the time the vessel should be ready to discharge the cargo, and written notice thereof given to the charterers or their agents,—and that, for each day of detention by default of the charterers or their agents, $59.46 should be paid; vessel to discharge at safe anchorage ground in Rio Bay, designated by charterers or their agents.  It also contained the following clause:

"The bills of lading to be signed as presented, without prejudice to this charter.  Any difference in freight to be settled before the vessel's departure from port of loading.  If in vessel's favor, in cash, less insurance.  If in charterers' favor, by captain's draft upon his consignees, payable ten days after arrival of vessel at port of discharge.  Vessel to have absolute lien upon the cargo for all freight, dead freight, and demurrage; charterers' responsibility to cease when the vessel is loaded, and bills of lading are signed."

The libel alleges that the vessel arrived at Rio de Janeiro, having on board 514,256 feet of lumber, September 4, 1893, and duly gave notice to the agents of the charterers that she was ready to discharge, and the vessel was in fact ready to discharge at that time; that the charterers designated an anchorage as required by the charter, and on the 5th day of September, 1893, the vessel hauled to the anchorage, and on the 6th day of September commenced the discharge of her cargo.  It then alleges that for various periods of time between that date and the 28th day of November, 1893, aggregating 53 days, the discharge of the vessel was suspended by the consignees, and that during all the time of suspension the vessel was ready and willing to discharge.

The answer alleges that, when the vessel was laden, bills of lading of similar tenor for the whole of the cargo were duly signed by the master of the vessel, which bills of lading were duly transferred to parties who became consignees of the cargo, and that

thereupon all liability of the charterers to the owners of the vessel, under the charter party, ceased, and it became the duty of the master and owner of the vessel, upon the failure of the consignees to discharge her pursuant to the terms of the charter party, to notify said consignees of the amount of demurrage claimed by reason of said failure, and to hold said cargo until the same should have been paid. The answer further alleges that when the vessel arrived at Rio de Janeiro the consignees of the cargo used all reasonable diligence in and about receiving the cargo shipped upon the said vessel, and removing the same therefrom; that the libelants were prevented from discharging the cargo, and the respondents were prevented from receiving the same, any sooner than was done, by reason of the act of the public enemy, to wit, certain vessels of war which were then in the harbor of Rio de Janeiro, and were engaged in firing upon the forts in said harbor, and making war upon the government of Brazil; that the firing between said vessels of war and the said forts made it impossible to discharge the said cargo, or to receive it from the said vessel, any sooner than it was discharged or received; and that the detention alleged in the libel was caused by said acts of the public enemy, and not by any default of the respondents. It also alleges that the master of the vessel and the agents of the libelants acquiesced in the delay, and recognized the necessity therefor, and that when the cargo was delivered the agents of the libelants accepted and received from said consignees a sum mentioned, in full satisfaction and payment of all claim and demand under said charter party, and an account was made and stated between them and the consignees respecting all claims under the charter party aforesaid, and the balance due upon said accounting was paid by the said consignees to the said agents, and accepted and received by them in full satisfaction thereof. The answer sets forth a copy of one of the bills of lading. The bill of lading shows a shipment of cargo by the charterers, and provides for the delivery of the cargo upon the order of the charterers, or to their assigns, "they paying freight for the said lumber as per charter party."

The second exception to the answer is to that part which relies upon the defense that the liability of the charterers was to cease upon the loading of the cargo, and signing of bills of lading. The question thus presented has been considered in the court below, and we concur in the opinion of the learned district judge in respect to it. That opinion (65 Fed. 104) so fully and satisfactorily discusses the question that we quote it, and deem it unnecessary to enlarge upon it. Judge Brown said:

"The provisions of the charter party are, in form, contradictory. One clause declares that for every detention by default in receiving or discharging the cargo by said parties of the second part, or agent (the respondents), the demurrage, as above specified, shall be paid by them. The other clause declares that their responsibility shall cease when the vessel is loaded, and bills of lading are signed. A previous clause also provided that the cargo should be discharged at the port of destination at the rate of 20,000 per day.

"The general intent of these provisions, taken together, manifestly, is that the ship shall be paid, not only freight, but demurrage, for detention beyond the stipulated time in discharging. The various clauses of the charter

In this regard should be interpreted consistently, so far as possible, with this general purpose, as well as with its further presumed purpose to relieve the charterers from the responsibilities attending a discharge of cargo to purchasers in distant ports, where the ship, by means of the other provisions of the charter, having secured to her a lien upon the cargo for both freight and demurrage, has it in her power to enforce payment of her claims by means of that lien, without a resort to the charterers. In the cases of Clink v. Radford [1891] 1 Q. B. 625, and Hansen v. Harrold [1894] 1 Q. B. 612, the relation of these clauses to each other have been recently carefully considered in the English court of appeal; and the rule laid down is that these different clauses are to be applied and construed with reference to each other, and to the purposes above stated, and that, where 'the provision for cesser of liability is accompanied by the stipulation as to lien, then the cesser of liability is not to apply, in so far as the lien which, by the charter party, the charterers are enabled to create, is not equivalent to the liability of the charterers,' and that, 'where the provisions of the charter party enable the charterers to make such terms with the shippers that the lien which is created is not commensurate with the liability of the charterers under the charter party, then the cesser clause will only apply so far as the lien which can be exercised by the shipowner is commensurate with such liability.'

"This is substantially the construction that was given by this court to the cesser clause in the case of Hatton v. De Belaunzaran, 26 Fed. 780, where, notwithstanding the cesser clause, the charterer was held liable to pay demurrage because, under the right to effect a subcharter, he had required the ship to take a cargo of salt, not of sufficient value at the port of discharge to pay anything more than the freight stipulated for in the subcharter.

"In the present case the respondents, as charterers, had the right to require the master to sign bills of lading as presented, without prejudice to the charter. This does not mean that the bill of lading itself, or the consignee under it, should be subject to all the obligations of the charter. It means only that the charterers' obligations to the ship and owners should not be affected by the terms of the bill of lading thus signed on the charterers' requirement. Gledstanes v. Allen, 12 C. B. 202.

"The bill of lading for the lumber in question provided for 'paying freight for said lumber as per charter party dated 7th March, 1893, and average accustomed.' A bill of lading in this form imposed upon the indorsee of the bill of lading who received the goods under it none of the stipulations of the charter, except such as pertained to the payment of freight. Chappel v. Comfort, 10 C. B. (N. S.) 802; Smith v. Sieveking, 4 El. & Bl. 945; Fry v. Mercantile Bank, L. R. 1 C. P. 689; Dayton v. Parke, 142 N. Y. 391, 400, 37 N. E. 642. It was no notice to him of any other provisions of the charter, such as that he must discharge a certain quantity of lumber per day, or, in default thereof, pay a specified price per day for any further detention of the vessel. Under this bill of lading, the vendee was entitled to take the goods within a reasonable time, according to the circumstances, on arrival, and under the ordinary rules of law as to liability to damages for detention, such as apply in the absence of any specific agreement. This is a very different liability from that of a specific agreement that assumes all risks of detention, from whatever cause, and agrees upon a specified rate of damages.

"Had the bill of lading provided for the payment of freight and 'all other conditions as per charter party,' the latter provision would have been construed ejusdem generis, as imposing upon the consignee the payment of something more than freight, and would have included the obligations referred to in the charter party respecting the rate of delivery, and the payment of the demurrage specified, though not necessarily including independent provisions of the charter party relating to different subjects. Russell v. Niemann, 17 C. B. (N. S.) 162; Serraino v. Campbell, 25 Q. B. Div. 501; Id., [1891] 1 Q. B. 283; Wegener v. Smith, 15 C. B. 285; Porteus v. Watney, 3 Q. B. Div. 534.

"What the respondents, therefore, in this case, virtually required the master to do, was to give a bill of lading for this lumber that required the master to deliver it to the indorsee of the bill of lading without the payment of any charter demurrage at all, such as the respondents had agreed should be paid, but which bound the consignee to pay for such demurrage only as might arise through his own fault. Whether this was done inadvertently

or by design, is immaterial, as respects the ship. For the ship could only claim of the vendee according to the bill of lading. The H. G. Johnson, 48 Fed. 696. The bill of lading required the ship to deliver the cargo contrary to that provision of the charter which provided that the ship should have a lien on the cargo for the charter demurrage. The cesser clause and the lien clauses were dependent provisions; each was a consideration for the other; and when the charterers required the ship to forego the benefit of her lien on the cargo for the charter demurrage, by presenting, and taking from the master, under the bill of lading clause in the charter, a bill of lading which did not admit of a lien for charter demurrage on this cargo, the charterers could not claim the benefit of the cesser clause as a release of the previous general clause of the charter, which made them answerable for demurrage. The decisions above quoted sustain this construction, which will be followed by me, as a just and reasonable construction of these several clauses."

The third exception to the answer is to that part which sets up the defense that the detention of the vessel beyond the charter period of discharging was caused by the acts of the public enemy, and not by the default of the charterers. The provision in the charter that the cargo was to be discharged at the rate of a specified quantity per day is the equivalent of the one frequently incorporated into such instruments, conditioned for the discharge of the cargo within a specified time.

"When the time is definitely fixed, or is described so as to be calculable beforehand, there is an absolute obligation on the charterer to have the work completed within that period, whatever circumstances occur. He is answerable, although the completion may have become impossible, owing to causes which have arisen without any fault or omission on his part. Thus, he bears the risk of delay arising from the crowded state of the place at which the ship is to load or discharge (Randall v. Lynch, 2 Camp. 352); or from frost (Barret v. Dutton, 4 Camp. 333), or bad weather (Thiis v. Byers, 1 Q. B. Div. 244), preventing access to the vessel; or from acts of the government of the place, prohibiting export, or preventing communication with the ship (Barker v. Hodgson, 3 Maule & S. 267; Blight v. Page, 3 Bos. & P. 295, note). And it is immaterial that the shipowner also is prevented from doing his part of the work within the agreed time, unless he is in fault. The charterer takes the risk." Carv. Carr. by Sea, §§ 610. 611.

The doctrine thus stated has been frequently declared in the adjudications. Thus, in Davis v. Wallace, 3 Cliff. 131, Fed. Cas. No. 3,657, it was said:

"The settled rule is that, where the contract of affreightment expressly stipulates that a given number of days shall be allowed for the discharge of the cargo, that such a limitation is an express stipulation that the vessel shall in no event be detained longer for that purpose, and that, if so detained, it shall be considered as the delay of the freighter, even where it was not occasioned by his fault, but was inevitable. Where the contract is that the ship shall be unladen within a certain number of days, it is no defense to an action for demurrage that the overdelay was occasioned by the crowded state of the docks, or by port regulations or government restraints. Detention of the vessel, for loading or discharging, longer than the time allowed by the contract, entitles the owner to the stipulated demurrage, although it was impossible to complete the work within that time, by natural causes."

To the same effect are the following authorities: Cargo ex Argos, L. R. 5 P. C. 161; Waugh v. Morris, L. R. 8 Q. B. 202; Davies v. McVeagh, 4 Exch. Div. 265; Postlethwaite v. Freeland, 5 App. Cas. 617; Leer v. Yates, 3 Taunt. 387; Grant v. Coverdale, 9 App. Cas. 470; Budgett v. Binnington, 25 Q. B. Div. 320.

The appellees cite several decisions holding that, where a failure to perform is caused by vis major, demurrage is not recoverable. Ford

v. Cotesworth, L. R. 4 Q. B. 127; Id., L. R. 5 Q. B. 544; Cunningham v. Dunn, 3 C. P. Div. 443; Riley v. Cargo of Iron Pipes, 40 Fed. 605; The J. E. Owen, 54 Fed. 185; Dahl v. Nelson, 6 App. Cas. 38; Carsanego v. Wheeler, 16 Fed. 248; The Spartan, 25 Fed. 44. It suffices to say that these were cases in which no specified time was fixed by the contract, within which the vessel should be discharged, but the contract provided for a discharge with customary dispatch, or for a discharge.after a precedent condition, such as the arrival of the ship in a proper discharging berth. Undoubtedly, when the contract is silent on the subject of demurrage, it is only recoverable when made to appear that she was not discharged with customary diligence because of some fault or negligence on the part of the consignee, and in such a case the defense of vis major is a perfect answer to the action.

It is contended for the appellees that the charterers are not liable in the present case because, by the language of the charter party, demurrage is payable only "for each day of detention by default of the charterers or their agents"; that default means negligence, or willful omission; and that the facts alleged in the answer sufficiently excuse the charterers. In one sense, any failure is a default, whether it arises from the omission to perform a contract, or from a neglect of duty. In many reported cases the omission to pay a debt or to perform a contract is spoken of as a default. We think it was used in that sense in the present contract. In 1,600 Tons of Nitrate of Soda v. McLeod, 10 C. C. A. 115, 61 Fed. 849, it was decided by the circuit court of appeals for the Ninth circuit that a charter party which made the charterer liable for demurrage only when caused by his default did not relieve him from liability for delay caused by omission to perform his covenants, even though he was not guilty of negligence. The clause in the charter party in that case was expressed identically as in the present charter party.

The fourth exception is to that part of the answer which sets up payment of £515. 6s. 5d. to the agents of the libelants, when the cargo was delivered, in full satisfaction of all claims and demands under the charter party. The argument advanced to sustain this exception is that the answer does not aver that the agents of the libelants to whom the payment was made had authority to accept a sum which did not include the full claim for demurrage. It suffices, to meet this argument, and to dispose of the exception, that the 13th article of the libel states, by way of an anticipatory averment, that the agents had no authority to enter into any accord and satisfaction with the charterers, or to receive the sum paid for any purpose, except as a payment for freight, and the answer denies this statement. This denial is the equivalent of an affirmative averment. Upon the allegations in the libel and answer, the question whether there was an accord and satisfaction, made by those having authority to represent the libelants therefor, is a question of fact, to be determined upon a view of all the incidents of the transaction when the proofs are before the court.

We conclude that the second and third exceptions should be sustained, and the other exceptions overruled.

Ordered. accordingly.