HURON BARGE CO. v. TURNEY et al.

(District Court, N. D. Ohio, E. D. February 6, 1896.)

No. 2,120.

1. SHIPPING—PAROL CHARTER PARTY—BILL OF LADING.
    A parol charter party, actually made and established, will control a bill
    of lading which is inconsistent with it. Burrill v. Crossman, 65 Fed. 104,
    followed.
2. SAME—DEMURRAGE—ARRIVAL FOR LOADING—EXCUSABLE DELAY.
    A provision in a charter party that the vessel shall arrive ready for load-
    ing on a given day is subject to the perils of navigation, and failure, from
    such perils, to arrive on that day, does not excuse the charterers from per-
    forming their contract.
3. SAME—LAY DAYS.
    A stipulation for definite lay days binds the charterer to complete the
    lading within that time, and he is responsible for delay, even when caused
    without his fault,—as by a fire at the dock, which destroys the machinery
    depended on for loading. Burrill v. Crossman, 16 C. C. A. 381, 69 Fed.
    750, and Davis v. Wallace, Fed. Cas. No. 3,657, followed.

Hoyt, Dustin & Kelley, for libelant.

Squire, Sanders & Dempsey, for respondents.

RICKS, District Judge.    This is a libel filed by the Huron Barge
Company, a corporation under the laws of the state of Ohio, owner
of the steamer Pathfinder and schooner Sagamore, and claims
$4,131.12, as demurrage and damages, for failure of the respondents
to load at the port of Cleveland, Ohio, and unload at the port of
Manitowoc, Wis., two cargoes of coal on the vessels named. The
libel avers that, on the 14th day of November, 1893, a charter con-
tract was made between the libelant and the respondents, by
which the latter agreed to carry and deliver at Manitowoc, Wis.,
soft coal on the steamer Pathfinder and barge Sagamore, at the
rate of 60 cents per ton, said vessels to be loaded in two days, at
two different berths, from the docks at Cleveland, and to be un-
loaded in two days at two different berths, at the port of destina-
tion, at Manitowoc.    The answer admits that a charter was made
on the day named, but alleges that the terms of said charter were
that the said steamer Pathfinder and barge Sagamore were "to
have been at the Cleveland, Canton & Southern dock, in Cleveland,
Ohio, on the morning of Friday, November 17th, to start loading;
that, in pursuance of this arrangement, all the coal destined to be
shipped to Manitowoc, as aforesaid, was placed on the tracks, and
both plants at the Connotton dock were ready for loading, and the
laborers employed for that purpose were waiting for the boats, on
the morning of November 17th, as aforesaid, and that, if they had
arrived in accordance with the charter, each boat would have had
a clear dock, and would have been loaded by the night of Saturday,
November 18th, without fail; that they could then have gone to
Manitowoc, there discharged their cargoes, and fulfilled their obli-
gations under the charter aforesaid, in accordance with its terms."
The answer further claims that, through the bad judgment and

management of the libelant, said vessels were not brought to this port on the morning of the 17th, as they might have been; that the boats did arrive at Cleveland on the morning of November 19th, but that the barge was not unloaded, although the steamer was, and arrangements were straightway made to load the steamer, commencing Sunday; but the answers avers that, in winding in one of the slips of the Cuyahoga river, the steamer Pathfinder broke her wheel, which made it necessary for her to go upon the dry dock, and which prevented her from coming to the dock to load, according to the terms of the charter. The answer further avers that, on the night of the 20th of November, the McMyler hoisting machinery on the docks of the Cleveland, Canton & Southern Railroad was destroyed by fire. They further aver that, if it had not been for the negligence and carelessness on the part of the libelant to fulfill its contract, and have its boats at the dock for loading on the 17th, they would have been loaded in time, and well on their way up the lakes to Manitowoc; that, after this fire, the libelant, with full knowledge of the situation, allowed the two vessels to be loaded at the Lindsay hoists, the remaining machinery on said docks left for use in loading vessels, and that the loading thereafter proceeded without delay. Respondents further deny that the charter of the two boats provided that they should be unloaded at Manitowoc in two days, and that separate berths should be there furnished for such unloading. They deny that there was any unnecessary delay at Manitowoc, and claim that the boats were unloaded with due diligence. It is conceded by the proctors for both parties that this case turns entirely upon a question of fact, to wit, whether the charter made for these two vessels on the 14th of November, 1893, between Mr. Coulby, acting for and on behalf of the libelant, and Mr. McNally, acting for and on behalf of the respondents, contained a distinct provision that the vessels should be loaded at two berths at the Connotton docks, at the port of Cleveland, within two days, and should be unloaded at Manitowoc, the port of destination, at two separate berths, and in two days. Mr. Coulby, on his part, swears positively that that was the condition of the charter. Mr. McNally denies that the charter contained this condition, and claims that the contract was substantially as set up in the respondents' answer.

In this direct and sharp conflict between these two witnesses, it becomes very important for the court to look to all the surroundings and determine which one of them is corroborated by the facts and surrounding circumstances. Coulby impressed me as a witness, cautious, conservative, feeling the responsibilities of his position, slow to act, and careful in his statement of facts. McNally impressed me as a man of ambition, energy, and dash,—one who would be more likely to accept chances in making a contract, and more inclined to take risks and act hastily, than Coulby. In view of these respective traits, it becomes important to consider well all the corroborating circumstances. The situation of the parties when negotiations began was this: The close of navigation for the

year was near at hand. Libelants had vessels they were anxious to load in the shortest possible time, so as to get to the upper lakes; and unload in time to make one more trip before the season ended. They were offered hard-coal cargoes, with quick dispatch in loading, but uncertain dispatch in unloading at the port of destination. Short lay days at both ports was what they were seeking. Respondents were advised that this was libelant's desire. They had soft-coal cargoes they wanted to send to Manitowoc before the season ended. They were anxious to make a charter on satisfactory terms. The facts as to the probability that respondents would insure the quick dispatch, as claimed by the libelant, are as follows: It is conceded by the proctor for the respondents that, before the fire, when the Cleveland, Canton & Southern Railroad docks had the McMyler hoists and Lindsay machine in full operation, these two vessels could easily have been loaded in two days. This admission is fully sustained by the evidence of Mr. Moore and Mr. Keeley. With this knowledge on the part of Mr. McNally of the facilities of said dock for loading, he would not have considered that he was making a strained or hazardous contract in guarantying such quick dispatch. Mr. Murray, who at the time was interested in the coal department of Pickands, Mather & Co., testifies that, while his firm had this charter contract under consideration, he visited the Connotton docks, and talked with Mr. Moore as to the facilities of said docks, and was assured that the coal would be ready on the cars, and "that they would give the boats a good whirl." Mr. Moore says, on this same subject, that Murray called upon him, and said they were considering chartering two boats to Turney & Co., and that they wanted a clear dock, and assurances that they could be loaded in two days; and that he told Murray that they could do it. Mr. Moore and Mr. Keeley both testify as to conversations had with Mr. McNally, on behalf of the respondents, about the time the boats were expected, and that they were advised that the expectation was that said boats should be loaded in two days, and that everything should be in readiness to give them such quick dispatch. Mr. Coulby stated in his examination that he dictated to a stenographer the facts connected with the negotiations, and the terms of the charter party, and on each day pending the negotiations concerning the loading of these vessels he dictated the conversations and occurrences; and he had in court, from which to refresh his recollection, a complete diary of such transactions. We have, then, in support of the libelant's contentions, the direct testimony of Mr. Coulby, with his recollection, refreshed as just stated, corroborated by the fact that the Connotton dock, where it was proposed to load these vessels, had facilities to easily load them within the two days named. We have the evidence of Mr. Moore that, pending the negotiations, he assured Mr. Murray that the boats could be loaded in two days. We have the further evidence of Mr. Moore and Mr. Keeley that they were advised by Mr. McNally that the expectation was that these vessels should be loaded within two days. Before the vessels were actual-

ly loaded, and while efforts were being made to expedite their load-ing, a telegram was sent to the respondents by the libelants, in which the former were advised:

"Your representative here chartered our steamer Pathfinder and consort Sagamore, on the understanding that they should be loaded in two days, and unloaded in same time," etc.

This telegram was brought to the attention of Mr. McNally, the agent for the respondents, when it was evident to him that a serious contention was being made as to the terms of said charter, but there is no evidence to show that he repudiated the construction put upon the charter by the libelant that the vessels were to be loaded and unloaded in two days, or treated it as a new and unex-pected claim on their part. While he confidently assured his prin-cipals that the libelant's claim for demurrage could not be success-fully maintained, he did not in his letters place it upon the basis that the claim of definite lay days was false. His failure to em-phatically repudiate this important claim is, to my mind, very sig-nificant. In his cross-examination, while he denied that no guar-anty was made, as claimed, yet he refused to say that nothing was said about lay days, but evaded stating just what was said. He says the proctors for respondents advised him that no claim for demurrage could be sustained, but we do not know what repre-sentation he made to them as to the facts. Upon the case as stated to them, their opinion was no doubt sound. The answer is some indication as to what his statements were.

The contention urged by the proctor for the respondents is that there was, in fact, no binding contract made between the repre-sentatives of those two parties; that their minds did not meet; that they did not understand that a contract was made by which the respondents guarantied to the libelants this assurance of such quick dispatch; that no such contract was ever before made by McNally, as agent for the respondents; that no such guaranty was ever before made by the respondents themselves; that it is not probable that their agent would have made such a contract, be-cause, by so doing, he was undertaking to guaranty that the Cleve-land, Canton & Southern Railroad Company, which had control of the docks, would do their full duty, when he had no authority to enforce such performance on their part; that he was likewise un-dertaking to guaranty the performance of a duty by the Manitowoc Dock Company at the port of destination, when he did not know their dock facilities there, and had no control to compel them to give the quick dispatch libelants claim; that all the libelants claimed in their Chicago telegram was that there was an "under-standing" that the vessels should be loaded in two days, which is far from asserting that there was any "guaranty." It is further contended that the bill of lading, which was signed, after the boats were loaded and had departed from this port, by the libelants, ex-presses the contract as the respondents understood it, and that the provision in said bill of lading that "the consignor shall not be held liable for any delay at the port of destination" was notice to the

libelants that the respondents' agent had no authority to guaranty the quick dispatch of two days, and that by so doing he would overstep his authority.

As to the respondents' contention that McNally would not probably have guarantied the quick dispatch of two days at this port, it may be said that, as the facilities of the Connotton dock were well known to justify such a guaranty, it would not be an improbable or hazardous assurance for McNally to make. It is more improbable that he should have made a guaranty of such quick dispatch at the port of destination, where he was ignorant as to the facilities or the situation that would likely confront the vessels on their arrival at that port. I confess the question of fact presented is difficult to decide. The libelant is required to make out its contention by a fair preponderance of the evidence. By holding the respondents to the strict letter of the charter party, as contended for by the libelant, all the risks and chances are thrown upon the former. The evidence shows clearly that the failure to load the vessels at the port of Cleveland was entirely without the fault of the respondents. The unfortunate fire at the Connotton docks made it impossible to load the vessels any sooner than was done, while it appears very clear that if the vessels had arrived at this port when they were expected, on the 17th of November, the respondents would have been able to carry out their contract without trouble. But, notwithstanding such hardships, the question still remains whether, as a matter of fact, the guaranty for lay days was made as the libelants allege. I have hereinbefore marshaled all the facts and corroborating circumstances which tend to support the claim of the libelants, and it seems to me the fair preponderance of testimony shows that a contract such as libelants claim was in fact made by McNally, and that he had authority to make it. A strict construction of the pleadings would hold the respondents to an admission of such authority; but the evidence, I think, fairly establishes the power of McNally to make such a contract on behalf of his principals. When they were advised by the telegram of November 23, 1893, that such a contract was made by their agent, they did not repudiate his authority, but seemed to urge that every effort should be made to carry out the understanding in good faith.

It is claimed by the proctor for the respondents that the bill of lading expresses the contract which was made between the agents of the two parties. The bill of lading particularly exempts the consignor from liability for delay at the port of destination. If this bill of lading had been signed before the boats were loaded, or before they left this port, and after the parol negotiations had taken place, I would be inclined to accept it as expressing the contract made between the parties. But both the libel and the answer proceed upon the theory that the charter contract was made in parol; and, where it is established that such a parol charter party was made, even if inconsistent with the bill of lading, the parol charter will control. Burrill v. Crossman, 65 Fed. 104. I therefore think

the bill of lading throws little light upon the contract actually made. It says nothing with reference to lay days at this port, and entirely exempts the consignor from any delay at the port of destination. The only elements of the contract actually made to which it refers are the price per ton to be paid, and the tonnage transported. It cannot therefore be claimed to express the contract as claimed by either party. I do not understand the proctor for the respondents to claim that, because libelant's vessels were not in Cleveland ready to load on the 17th, they are thereby excused from performing the contract, or that the libelant was obliged to carry out said obligation without reference to the perils of navigation. I understand the rule of law to be well settled that such provisions in charters are always subject to the perils of navigation. Having found that a contract for definite lay days was in fact made, the law is very clear. In the case of Burrill v. Crossman, 16 C. C. A. 381, 69 Fed. 750, the court of appeals of the Second circuit say:

"When the time is definitely fixed, or is described so as to be calculable beforehand, there is an absolute obligation on the charterer to have the work completed within the period, whatever circumstances occur."

They further quote approvingly from the case of Davis v. Wallace, Fed. Cas. No. 3,657, as follows:

"The settled rule is that, where the contract of affreightment expressly stipulates that a given number of days shall be allowed for the discharge of the cargo, that such a limitation is an express stipulation that the vessel shall in no event be detained longer for that purpose, and that, if so detained, it shall be considered as the delay of the freighter, even where it was not occasioned by his fault, but was inevitable. When the contract is that the ship shall be unladen within a certain number of days, it is no defense to an action for demurrage that the overdelay was occasioned by the crowded state of the docks, or by private regulations or government restraints. The detention of the vessel for such lading or discharging longer than the time allowed by the contract entitled the owner to the stipulated demurrage, although it was impossible to complete the work within that time, by natural causes."

Having found as a fact that, under the charter contract, the respondents were to load and unload the vessels in two days, and having found the rule of law as above stated, it follows that the libelant is entitled to recover in this case. A decree may be drawn, referring the case to H. F. Carleton, as commissioner, to ascertain the damages the libelant has suffered by reason of the detention set forth in its libel, and he will report his conclusions, and the testimony taken, to the court.