SOUTHERN TRANSP. CO. v. UNKEL.

(District Court, E. D. Pennsylvania. November 1, 1916.)

No. 26.

1. SHIPPING ☞175—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY—"DEFAULT."

The word "default," as used in a provision of a charter party fixing the lay days for loading and requiring payment of a fixed sum per day "for each and every day's detention by default" of the charterer, merely means the failure to load within the stipulated time, and does not involve any question of fault or negligence.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 572–574; Dec. Dig. ☞175.

For other definitions, see Words and Phrases, First and Second Series, Default.]

2. SHIPPING ☞179—CHARTER—DEMURRAGE—DEFAULT.

Unusually cold weather during the loading of a barge in January, which in fact delayed the loading, but did not actually prevent it, did not relieve the charterer from liability for demurrage, under a provision requiring him to pay demurrage for delay through his default.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 586; Dec. Dig. ☞179.]

3. SHIPPING ☞180—DEMURRAGE—LIABILITY OF CHARTERER.

Where a vessel was bound by her charter to deliver her cargo of lumber at the rail, from where it was to be taken by the charterer, and the consignee of the cargo was stevedore for both vessel and charterer, the charterer cannot be held liable for demurrage because of delay in unloading, due to the stevedore's refusal at first to handle the lumber because of its icy condition, and therefore to perform the initial duty of the vessel to deliver it at the rail.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 587, 588; Dec. Dig. ☞180.]

In Admiralty. Suit by the Southern Transportation Company against F. W. Unkel. Decree for libelant.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Lewis, Adler & Laws, of Philadelphia, Pa., for libelant.
Howard M. Long, of Philadelphia, Pa., for respondent.

DICKINSON, District Judge. This controversy had its beginnings in two charter parties entered into, one on November 13, 1914, for the charter of the barge Pamunky; the other on December 12, 1914, for the charter of the barge Wicomico. The barges were to carry lumber from Acquia Creek, Va., to Philadelphia. The place of shipment in the first charter party is given as Quantico, and in the other as Cole Landing. The pertinent provisions of the contracts will be stated in connection with the points raised.

The claim of the libel is for demurrage, dead freight, and towage. The issues as raised by the pleadings, supported by the evidence and discussed by counsel, can be best presented by treating each barge as a claimant, and considering the claims of each separately. The claim of the Pamunky, as set forth in the libel, is this:

The contract was that the respondent should "load and stow" the lumber on the barge. The "lay days," or days allowed for loading, should "commence from the time the captain reports his barge ready to receive cargo." Ten of such lay days were allowed the charterer, but Sundays and legal holidays were to be excluded from the count, and also days on which the charterer was "prevented from working the major portion of the day by rain." The vessel was to be paid $2.25 per M. for carrying the lumber and $15 per day "for each and every day's detention by default" of the charterer. The claim is for $52.50 for such demurrage. The barge is averred to have been reported by her master ready to receive cargo at 12 o'clock noon November 18, 1914, and that her loading was not completed until 2:40 p. m. December 4, 1914, whereby a demurrage charge for 3½ days had accrued to the vessel.

The answer sets up some defenses not necessary to consider. The sufficient one is the averment of the loading having been completed on December 1, 1914, and within the 10 lay days allowed by the charter party. It will perhaps contribute to the clarity of the discussion if the position of the litigants is stated and then the facts found from the evidence. If the vessel was in fact loaded by noon of December 1st, the days would, on the vessel's own count, be just 10. The libelant claims, however, this half day and additional days for December 2d, 3d, and 4th, making the total count of 3½ days. The merit of the claim turns upon when the loading of the boat was completed.

The real defense is that the loading was done by December 1st, so that the boat was free to sail within the 10 days allowed for loading. The fact would clearly seem to be, and is so found, so far as the charterer was concerned, that the loading was so completed. Mr. Wallace had some lumber of his own, not sold to the charterer, which he desired to ship to Philadelphia, on the venture that Mr. Unkel might be persuaded to buy it, and that, if he did not, some one else would. There was not much of it, either in quantity or value. The captain agreed that it might be put aboard and carried on the account of Mr. Wallace, if put aboard before the vessel was ready to sail. There was

good judgment in his doing so, and therefore nothing improbable in the statement that he had so done. He could safely take it and thereby earn additional freight. The putting of it aboard involved no delay. The agent of the charterer could have no valid objections, if it was understood that it was not loaded on his account, nor made the subject of a demurrage charge. At all events, under this view of the facts, there was "no detention" of the vessel due to the "default" of the charterer.

The testimony of the captain is not inconsistent with this version. He admits he had planned to take his boat away on December 1st. He admits he said he would sail as soon as the tug arrived, whether all of the lumber was then aboard or not. He does not deny that the quantity of lumber put aboard after December 1st was small and of little value. All that he denies is that he expressed any opinion as to when the lay days expired. In view of the attitude of his employers when his testimony was given, this is not surprising. Under the finding of fact made, the libel as to this item of claim should be dismissed. The question of when the lay days began to run is eliminated by the finding of facts.

Presenting, in like manner, the claim made on behalf of the Wicomico, we have first a similar claim for demurrage at Cole Landing, the port of loading. The provisions of the charter party are the same, except that the lay days are reduced to 7. The pertinent averments of the libel are these: The captain reported the vessel ready to receive cargo at 11:30 a. m. December 18, 1914. The loading was completed January 11, 1915. The elapsed time, excluding the excepted days, was 10 days. A demurrage claim of $45 for the 3 days' excess is in consequence made.

The answer again sets up a defense not necessary to consider. It further claims that on the demurrage days the charterer was prevented from loading by unusual and exceptionally severe weather conditions, which should excuse him of default. The tabulations made by counsel of the days of loading relieve the case of all questions except the one of weather conditions, other than the one stipulated in the contract, excusing the detention of the vessel. The libel claims only 3 days' delay. The days other than the first, and other than Sundays, holidays, and rainy days, exceed the demurrage demanded. If the excuse advanced is a valid one, the detention is brought easily within the number of lay days allowed. This, then, is the only question arising out of this branch of the case.

There is no dispute over the facts. The weather conditions were severe. They are found to be unusual in the sense in which we speak of unusually cold weather. They were not, however, unusual in the sense of being extraordinary, or beyond what they might be expected to be in that latitude. They did in fact practically interfere with and reasonably delay the loading. There was no actual prevention of the loading, but the difficulties presented were such that the finding might well be made that the delay in proceeding with it was not due to lack of diligence on the part of the charterer. In other words, if the demurrage claim had as its basis damages due to the culpable negligence

of the charterer, the finding of negligence might be refused. This claim, on the contrary, however, has a contract basis. The charterer agreed to load in a given number of days. If this were done, the vessel would be earning freight. If it were not done, the vessel would be idle for the overtime, and for this the charterer agreed to pay a per diem allowance. On the face of the contract it might be argued that the contract was not to pay for all the delay, but only for such part as was due to the "default" of the charterer, and default suggests the idea of culpability.

[1, 2] The real question is the interpretation of the clause "detention by default of the charterer," and either party, according as that meaning is, may retort upon the other, "If you wished the contract to be different from what it is, you should have so contracted." Discussion of the question is uncalled for, because it has been expressly ruled. "Default" does not mean "fault," but merely failure to comply with the agreement to complete the loading in the stipulated time. The only exception is vis major or its equivalent. If the case of Burrill v. Crossman (D. C.) 65 Fed. 104, had been consulted and its experience in the appellate courts as reported in 69 Fed. 747, 16 C. C. A. 381, and 179 U. S. 106, 21 Sup. Ct. 38, 45 L. Ed. 106, traced, and this had been followed up by consulting a table of the cases in which this case was cited, there would have been no occasion to submit this branch of the instant case for decision. This part of libelant's claim is allowed on the authority of Burrill v. Crossman.

[3] Another claim is made for $82.50, demurrage at the port for unloading. The averments of the libel are that the master reported the vessel as ready to discharge at 7:30 a. m. January 25, 1915, and that she was not discharged until 12:20 p. m. February 4, 1915. This is charged to have involved a detention of 5½ days. The terms of the charter party governing unloading vary, from those affecting loading, only in the respect that the time allowance is not measured by days, but by the quantity unloaded. It is made 50,000 feet per day. The cargo is averred to have been 162,258 feet, and the lay days to have expired January 29, 1915. The answer is based upon a further provision of the charter party that, while it was made the duty of the charterer to load and stow the lumber, it was also made the duty of the vessel to "discharge to rail." This duty it is averred the vessel did not fulfill until January 28, 1915, and not until then did the lay days commence to run against the charterer. There was, in consequence, no demurrage payable.

There is no substantial disagreement between the parties as to the facts in evidence. The dispute is as to an inference of fact to be drawn. In the view presented by libelant, the delay was caused by the refusal of the consignees to receive the lumber. The charterer says it was due to the fact that the vessel neglected to discharge. Whatever difficulty there may be thought to be in disposing of this branch of the case arises out of the fact that the consignees fulfilled the triune characters of consignees, stevedores for the ship, and stevedores for the charterer. The solution of the problem presented is to be found by the simple expedient of separating them into those different per-

sons. The initial cause of the controversy was the condition of the cargo. The lumber was frozen fast and hard. This made it difficult and expensive to handle. It was consigned to the Pearson & Ludachler Lumber Company. They demurred for several days over taking the lumber because of its frozen condition. Had they taken it, or done what they finally did, the present dispute would not have arisen. Had they been only and merely consignees, the delay would have been chargeable to the charterer. They were, however, more than consignees. They were the vessel's stevedores, to do its work of delivering the lumber at the rail of the ship. This they refused to do. Had they been only and merely the ship stevedores, again, clearly the barge could not have made the charterer pay for a delay which the vessel had itself caused. This is clear on principle and under all the authorities. They were, however, more than stevedores for the vessel. They were the stevedores of the charterer, and as such took the lumber at the rail when delivered to them by the vessel. Here, too, it is again clear that, had they been merely and only the stevedores of the charterer, and had they detained the vessel by delaying the unloading, the charterer must pay for the detention.

As they were in fact all three of these characters, on whom, then, does the loss fall? The answer would seem to be found in this: They were the vessel in discharging the cargo to the rail. The vessel, therefore, refused to so discharge as it was bound by the charter party to do. The charterer, through them, as stevedores, completed the unloading by taking the lumber at the rail. This, it is true he was bound to do, but as his failure was caused by the vessel it cannot visit the loss consequences upon him. This part of the libel claim is disallowed, and the libel as to it is dismissed. It might perhaps be well to explain the apparent difference in the count of days. This is due to the fact that the libelant (as on its theory it would have been justified in doing) counts all the days after January 29th, whether rainy or not. The respondent throws out (as on the facts as found it was justified in doing) the rainy days.

The dead freight claim of $57.75 is for a failure to supply the vessel with a full cargo. The freight earnings were based upon the size of the cargo. The charter party bound the charterer to furnish a full vessel load, both "under and on deck." The answer sets up the very complete defense, if true, that all and more cargo was supplied to the vessel than the captain would permit to be put aboard. To get the point of impingement of the libel and answer, we must bring in a further provision of the charter party and certain bearing facts. The charterer selected the loading place. It was his place to see that such loading place gave a sufficient depth of water. Between the loading place provided and the channel of the Potomac river was a sand bar. The charterer had the lumber to put on the barge. There is no dispute over the fact that the captain stopped the loading when the barge was down to 8 feet. The suggestions made as to lightering are of little value to us under the facts of the case. The facts do not require a ruling of whether the charterer was bound to deliver, or the vessel to receive, cargo outside the bar. The vessel was to be loaded at a berth to be

provided, and the berth provided was at the landing, not' outside the bar. The question to be decided is one of fact, and depends upon what took place at the wharf.

Neither the proofs nor the discussion of them are as helpful as they might have been made. The fact that the lumber was on the wharf to be loaded, that it was to the interest of the shipper to get it to market, and that the voyage was made without complaint of a shortage of cargo would so suggest a full one that we are justified in looking to the vessel for evidence of some facts justifying a finding of default on the part of the charterer. The first fact we have is the log book. Its statement is: "Finished loading at 2 p. m. Tuesday, January 11, 1915." This is consistent with a full load, and, although it may not confute a complaint of shortage, 'it certainly does not suggest it. The next fact we have is that the barge was then drawing 8 feet of water aft and 7 feet 4 inches forward. The positive evidence of the defense is that the captain then stopped the loading because the barge was hogged. If he so refused to take more cargo, the vessel surely cannot justly claim a shortage. The captain admits the refusal. He admits, also, that the barge had in fact hogged. He asserts that the refusal was because he could not get over the bar with more load, and that he offered to take more cargo if lightered to him outside the bar. There was evidence, also, that the owner had asked that additional cargo be lightered. The lightering question is, however, of no importance, if the master might have received, but refused, more cargo because of the condition of the barge. The weight of the evidence is that he did so refuse, and the admitted condition of the boat gives to the other evidence the added weight of probability. The libel is dismissed, also, as to this claim.

This brings us to the final claim for towage. No defense is interposed, except to the amount of the charge, because the services of another boat might have been secured for less. There is no need to extend this already overlong statement of findings, further than to make a finding of $30 in favor of the libelant.

A decree awarding the libelant $45 for demurrage and $30 for towage, with interest, and dismissing the other claims of the libel, may be submitted. The libelant is allowed one-half its costs, and the respondent is allowed the expense of the taking of his depositions, so far as taxable as costs.