### AKTIESELSKABET FIDO v. LLOYD BRAZILEIRO et al.
#### and other cases.

(District Court, S. D. New York. July 24, 1919.)

Nos. 67–192, 69–87, 69–88, 67–184, 68–248, 11–197, 68–354, 67–366, 68–332, 66–362, 67–322, 68–31, 67–209, 68–353, 67–210, 68–333.

1. Shipping ☞181—Lay days commence when ship actually ready to load.
    Under charter parties for sailing vessels requiring charterers to furnish ballast for stiffening before proceeding to loading ports, where they furnished coal of good grade, bought from reputable dealers, which was received without objection, but heated and was required to be taken out at ports of loading, neither owners nor charterers *held* in fault for such conditions, and lay days for loading *held* not to commence until such coal had been removed and the ships were actually ready to load cargo.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Shipping ©⟹175—Delay in loading held not "default," rendering charterer liable for demurrage.**

Failure to load ships within the time allowed by the charter parties, where it resulted from heating of coal furnished for stiffening, necessitating its removal, and for which neither owners nor charterers were in fault, *held* not through "default" of the charterers within the meaning of the charter parties, which rendered them liable for demurrage.

3. **Shipping ©⟹194—Cost of removing dangerous ballast, general average expenditure.**

The cost of removing coal furnished by charterers to ships for stiffening while proceeding to loading port, and which became dangerously heated on the way, making it necessary to remove it before loading cargo, for the safety of both ship and cargo, where neither owners nor charterers were in fault for its condition, *held* an expenditure in general average.

4. **Admiralty ©⟹14—Contract for sale of coal for ballast not maritime, cognizable in admiralty.**

A claim against sellers of coal furnished to charterers to be used as ballast on ships, for breach of warranty of quality, is not based on a maritime contract and not cognizable in admiralty.

In Admiralty. Libel by the Aktieselskabet Fido against the Lloyd Brazileiro, with Gano Moore & Co., Incorporated, and another, impleaded, heard with libels entitled as follows: Lloyd Brazileiro v. Aktieselskabet Fido, Claimant; Gano Moore & Co., Incorporated, v. Aktieselskabet Fido; Aktieselskabet Christianssand Corporation, Owner of the Sordwig, v. Berwind-White Coal Mining Company; Berwind-White Coal Mining Company v. Aktieselskabet Christianssand Corporation; Christianssand Shipping Company, Limited, v. American Coal Exporting Company (Knickerbocker Fuel Company, Respondent, Impleaded); American Coal Exporting Company v. Christianssand Shipping Company, Limited; Skibsakties Clyde v. S. S. Sorenson & Thorlief S. B. Nielson (Pocahontas Fuel Company, and Consolidation Coal Company, Impleaded, Respondents); Sorenson & Nielson v. Skibsakties Clyde; Aktieselskabet Christianssand Corporation v. Cia Commercio e Navegacao Company (Gano Moore & Co. and Knickerbocker Fuel Company, Impleaded), and cross-libel; Cia Commercio e Navegacao Company and Gano Moore & Co., Incorporated, v. Aktieselskabet Chistianssand Corporation; Bechs Rederi Akties, Owner of Norwegian barge Trio, v. American Coal Exporting Company (Knickerbocker Fuel Company, Respondents, Impleaded); American Coal Exporting Company v. Bechs Rederi Akties; Skibsacties Glommen v. Chesapeake & Ohio Coal & Coke Company (New York & Philadelphia Coal & Coke Company, Respondent, Impleaded); Chesapeake & Ohio Coal & Coke Company v. Skibsacties Glommen. All matters referred to commissioner for general average adjustment.

Haight, Sandford & Smith, C. S. Haight, and Wharton Poor, all of New York City, for libelants.

Burlingham, Veeder, Masten & Fearey, Charles C. Burlingham and John L. Galey, all of New York City, for Gano Moore & Co., Cia Commercio e Navegacao Co., and Lloyd Brazileiro.

©⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Macklin, Brown & Purdy and P. M. Brown, all of New York City, for Knickerbocker Fuel Co.

Kirlin, Woolsey & Hickox, and John M. Woolsey, all of New York City, for Sorenson & Nielson, as charterers, and Chesapeake & Ohio Coal & Coke Co.

Herbert Green, of New York City, for American Coal Exporting Co. and Berwind-White Coal Mining Co.

Henry W. Hardon, of New York City, for New York & Philadelphia Coal & Coke Co.

J. Walter Lord, of Baltimore, Md., and James K. Symmers, of New York City, for Consolidation Coal Co.

Edward E. Blodgett, of Boston, Mass., for Pocahontas Coal Co.


WARD, Circuit Judge. In the course of the European war, the United States compelled the owners of from 300,000 to 400,000 tons of Norwegian sailing tonnage, then in this country, to carry under a form of charter party prepared by the United States Shipping Board. In August and September, 1918, the government compelled all shippers of coal from the United States to South America to ship in vessels allocated to them by the United States Shipping Board under this form of charter. At the same time all miners and operators were compelled to consign their coal destined for the seaboard to the Tidewater Coal Exchange, by whose representative it was inspected at each port. The mines on the different railroads were classified in respect to the steam-producing qualities of their coal, into separate pools; each operator being credited with the number of cars he consigned to a particular pool. Purchasers from the mine operators were obliged to pay the prices fixed by the Fuel Administration, and to take their coal from the pool, whether it was wholly, or partly, their vendor's coal, or wholly coal of other operators. The purpose was to avoid delay and congestion, by treating the pool as an aggregate of cars containing the same quality and grade of coal, and deliverable upon all contracts for coal from that pool.

In this situation the seven Norwegian sailing vessels, Svalen, Fjong, Baunen, Trio, Dvgerso, Sordwig, and Clyde, belonging to the libelants, were allocated to the charterers to carry cargoes of bituminous steaming coal from Norfolk to Rio de Janeiro; six of them then lying at New York and one at Baltimore. The relevant clauses of the charter party are:

"2. If vessel is required to ship from her last port or berth of discharge in the United States to another port or berth to load, charterers shall furnish sufficient cargo or ballast for stiffening to enable vessel to shift ports or berths safely. Charterers to pay cost of towage, but time for shifting ports not to count as lay days. If ballast is furnished for stiffening to enable vessel to shift ports or berth safely, all cost, including loading and discharging, to be paid by charterers and time to count as lay days, just as if cargo was used for stiffening. Stiffening to be supplied when and where required or lay days to count. Master to give 48 hours' notice of readiness."

"5. Cargo to be delivered to vessel, loaded and stowed free of expense to vessel, and to be discharged by charterers or their agents at their expense. Master to give free use of vessels' winches, donkey boiler, and such tackle as may be on board. Vessel to be free of all lighterage.

"6. It is agreed that lay days for loading and discharging shall be as follows (if not sooner dispatched) : Commencing from the time vessel reaches loading or discharging port or dock, or berth, if available, and master has filed written notice to that effect and all customs formalities have been complied with. In the event of berth for loading or discharging not being available, lay days to count from the time captain gives notice of readiness to proceed to loading or discharging berth, vessel being duly entered and all other customs formalities complied with.

"7. Cargo to be *loaded* at the average rate of not less than *250 tons per running day, Sundays and holidays excepted,* and to be *discharged* at the average rate of not less than *250 tons per running day, Sundays and holidays excepted. Time reversible;* i. e., any time saved at loading port to apply at port of discharge. Charterers to have the privilege of working vessel on Sundays and holidays if they so desire, provided they pay all extra expenses and overtime, actually incurred by working cargo in connection with ship and cargo. Sundays and holidays so used not to count as lay days.

"8. And for each and every day's detention by default of said party of the second part or agents *twenty cents per ton, U. S. gold, of vessel's agreed deadweight capacity,* and pro rata for part of a day, shall be paid by said party of the second part, or agents, to the party of the first part, or agents payable day by day as earned. * * * *"

And for each and every day saved in loading or discharging 10 cents per ton measured in the same way was to be paid by the owners to the charterers. The vessels could not stand up empty, and the charterers had the privilege of supplying coal as stiffening to enable them to be towed to Norfolk for the balance of their cargoes, and they did so. Upon the arrival of each of these seven vessels there it was found that the stiffening was heating with a steadily rising temperature, and marine surveyors, employed by the masters, having recommended that it be discharged, it was by agreement discharged and sold by the charterers for account of whom it may concern, without prejudice to any claims they and the vessels' owners might mutually have, the one against the other. The vessels were then given new stiffening and loaded with coal, which they carried safely to Rio.

All this resulted in delay, and the owners filed these libels to recover demurrage from the charterers, on the ground that they were liable for loading coal stiffening which was unfit for shipment. The charterers filed answers, denying any liability for demurrage, and cross-libels to recover the expense of discharging the heated stiffening and of replacing it with new stiffening as for ship's account, or, if this claim were not sustained, then to recover contribution from the owner in general average, and in some of the cases for the value of the heated stiffening at destination, less freight and proceeds of sale, and in some of the cases for dispatch money for time saved in loading and discharging. In addition, charterers, who had purchased their coal stiffening, petitioned in their vendors under the fifty-ninth rule (29 Sup. Ct. xlvi), as being liable to indemnify them against any recovery by the owners, because of the unfitness of the coal for shipment.

I am referred to no case similar to this. All the charterers contracted with reliable people for coal from pools of good grade for export, which was discharged from the cars into barges, and loaded from the barges alongside the vessels in the usual way, without any objection by the masters. It is the law of this court that charterers are not liable

for concealed defects in the cargo or subject to any implied warranty of its fitness for shipment. The William J. Quillan, 180 Fed. 681, 103 C. C. A. 647. The tendency of coal to heat was as well known to the masters as it was to the charterers. If the coal was improperly loaded, as the libelants' experts testify, it was the duty of the masters to object. Olsen v. U. S. Shipping Co., 213 Fed. 18, 129 C. C. A. 607.

[1] I think neither the owners nor the charterers were at fault in respect to the coal, and the question is: When, under these circumstances, do the lay days begin to run? The obligation to load and discharge at the rate of 250 tons a day was not absolute, but conditional. It arose by the terms of the charter party, when the vessels were ready to receive cargo and had given written notice thereof. That they were not ready to receive the balance of the cargo is shown by the refusal of the masters to take it on board until the heated stiffening was discharged and replaced by new stiffening. The lay days did not begin to run at Norfolk until that time. The case of this coal, dangerous to the ship herself, is not at all like delay caused by the decay of fruit cargo or by attachment of cargo stowed under other cargo. I agree that when the vessels were really ready the charterers were at the risk of delay in getting berths, or caused by the government's appropriation of equipment, conditions which existed and were well known to all concerned when the charters were entered into. The cases relied upon by the libelants differ in the material particular that the vessels then in question were ready to load or discharge. Davis v. Wallace, 7 Fed. Cas. 182; Huron Barge Co. v. Turney (D. C.) 71 Fed. 972; Empire Transportation Co. v. P. & R. Coal & Iron Co., 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623.

[2] I think that, even if the vessels could be regarded, notwithstanding the heated stiffening, as ready to receive cargo, the charterers for another reason would not be liable for demurrage. The charter required them to pay demurrage for each day of detention by their own "default." Generally speaking, "default," as used in this connection, means failure to load or discharge within the agreed time, and not delay caused by the fault of the charterers. In other words, they take the risk of weather delays, strikes, crowded docks, etc. Still exceptions are recognized. In Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106, the vessel was ready to deliver and the charterer was ready to discharge, yet the Supreme Court held that he was not liable for demurrage, because his failure to discharge was due to hostilities prevailing in the port. This was held to be not a detention caused by his "default." It is true that the delay in this case was caused by vis major, but the reasoning of the court was not confined to that cause. Mr. Justice Gray, in delivering the opinion of the court said:

"In the case at bar, the defense of vis major, as pleaded in the answer, was that the shipowners were prevented from discharging the cargo, and the charterers were prevented from receiving it, any sooner than they did, by reason of acts of the public enemy, to wit, certain vessels of war, then in the harbor of Rio Janeiro, were engaged in firing upon the forts in the harbor and in making war upon the government of Brazil; that the firing between those ves-

267 F.—47

sels and those forts made it impossible to discharge or to receive the cargo from the vessel any sooner than it was discharged or received; and that the detention alleged in the libel was caused by those acts of the public enemy, and not by any default of the charterers. The vis major, so pleaded, was, in the words of opinions above cited, a 'superior force, acting directly upon the discharge of the cargo'; 'a direct and immediate vis major,' an 'unusual and extraordinary interruption that could not have been anticipated when the contract was made'; 'a sudden and unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers,' and an 'interference on the part of an armed force, preventing the handling or moving of the cargo.' Upon principle, and according to the general current of authority, the detention alleged was not caused by default of the charterers, and did not render them responsible for demurrage, under this charter party."

I think this heating of the coal was not an ordinary vicissitude, but a sudden and unexpected event, acting directly upon the further loading of cargo, without any fault whatever on the charterers' part, relieving them as fully from liability to pay demurrage as did the existence of hostilities in the Crossman Case. It is not at all like the case of cold or rainy or stormy weather, or of delay in getting a berth, or of strikes, all of which are matters of usual occurrence, fairly to be anticipated. Such are the cases relied upon by the libelants. Southern Transportation Co. v. Unkel (D. C.) 236 Fed. 779; New Rupperra Steamship Co. v. 2,000 Tons of Coal (D. C.) 124 Fed. 937; Peck v. United States (C .C.) 152 Fed. 524; The Olaf (D. C.) 248 Fed. 807.

The fact that these seven vessels, when only one-third loaded, with 500 to 800 tons of coal of good quality, should all in such a short time, two to three weeks, develop heat, indicating the imminence of spontaneous combustion, was most extraordinary and unprecedented. The proof is clear to this effect. No satisfactory explanation is offered by the libelants' experts why the stiffening coal should have heated, and yet that the vessels should have carried full cargoes of similar coal safely on the long voyage from Norfolk to Rio.

[3] The case seems to me plainly one of general average expenditures. The coal, whose temperature was steadily rising, if left in the vessels, was certain to be destroyed itself, and to injure or destroy them. It was not discharged merely to enable the voyage to be continued, but for the preservation of itself and the vessel from a common danger. The peril was real, certain, common to both, and clearly within the term "imminent," as used in the cases. The necessity of discharging the heated stiffening and of replacing it with new stiffening is admitted by all concerned, and I think it was the duty of the masters to discharge it.

[4] As to the sellers of coal brought in under the fifty-ninth rule, I cannot help saying that no considerations of speed or convenience can justify courts of admiralty in extending their jurisdiction to nonmaritime subjects. The sellers of the coal were entitled to have any claim against them for breach of warranty, express or implied, tried before a jury under the Seventh Amendment to the Constitution of the United States. Proceedings to limit liability are like proceedings in bankruptcy, and not at all analogous. At all events, there was no

express warranty, and I think there was no implied warranty, that the coal would not heat.

It follows that there must be a general average adjustment made, and for this purpose the causes will be referred to a commissioner. The claims, for demurrage, if any, and for dispatch money, if any accruing after the vessels were ready to receive cargo, cannot be determined until after the general average adjustment is made, and thereafter the commissioner may report upon these also, considering for the purpose the proofs already taken in the causes. In these important cases, presenting unusual questions, I should prefer that the parties agree upon a commissioner; but, if they do not, I will appoint one when the interlocutory decrees are entered.

The petitions under the fifty-ninth rule (29 Sup. Ct. xlvi) as to the sellers of the coal will be dismissed, with costs.