## THE GEYSIR (two cases).

(District Court, E. D. Virginia. July 19, 1920.)

No. 2455.

1. Shipping ☞39—Charterer liable for expense and delay caused by furnishing unsafe ballast.

Where a charterer, pursuant to a requirement of the charter party that it should furnish ballast for stiffening the vessel while proceeding to the loading port, furnished 500 tons of coal, which was to be a part of her cargo, but which, because of its unfit condition, heated and was required by the government to be taken out, which on charterer's refusal was done by the owner at large expense and delay, and replaced with sand, the charterer *held* liable for the cost of such removal and the delay caused thereby.

2. Shipping ☞39—Charterer not liable for expense of discharging ballast.

Under a charter party requiring the charterer to furnish free ballast for stiffening the ship to enable her to proceed to her loading port, the charterer *held* not liable for the expense of removing the same on reaching that port; such expense in the absence of charter provision, devolving on the vessel.

3. Shipping ☞39—Ship not entitled to freight on cargo not carried.

Where the charterer of a ship to carry a coal cargo furnished 500 tons of coal for ballast to enable her to proceed to her loading port, with the understanding that it should be a part of her cargo, but because of its heating it was necessary to remove the same and substitute other ballast, which was afterward discharged and a full cargo loaded, the ship *held* not entitled to freight on the 500 tons in addition to the cargo carried.

In Admiralty. Suit by Christian Aaborg, master of steel sailing ship Geysir, against the Brazilian Traction, Light & Power Company, Limited, and others, with cross-libel. Decree for libelant for part of claim.

Hughes, Little & Seawell, of Norfolk, Va., and George Forbes and John Phelps, both of Baltimore, Md., for the Geysir.

Hughes, Vandeventer & Eggleston, of Norfolk, Va., and Burlingham, Veeder, Masten & Fearey, and John L. Galey, all of New York City, for Brazilian Traction, Light & Power Co., and others.

WADDILL, District Judge. These suits were instituted to recover damages growing out of the alleged breach of a charter party entered into by J. H. Winchester & Co., as agents for the owners of the Geysir, and the Pearson Engineering Corporation, agent for Brazilian Traction, Light & Power Company, Limited, on the 4th day of September, 1918, in the city of New York. The charter party in question was for the transportation of about 2,800 tons of coal for a voyage from Norfolk or Newport News, one port only, at charterer's option, to Rio Janiero, Brazil, at the price of $19.50 per ton of 2,240 pounds, At the time of entering into the charter, the Geysir was upon the high seas, shortly due at Baltimore with a cargo, and after the discharge thereof was to proceed with all possible dispatch in ballast, to enter upon the new charter involved in these proceedings. The charter party in its fourteenth paragraph contains the following provision:

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

" * * * Charter to become null and void in the event of this ship being requisitioned by the Danish government. Owners to have the privilege of dry-docking and painting vessel at Baltimore. At Baltimore, charterers to furnish free stiffening when and where required by master. Charterers to pay vessel's towage from Baltimore to loading port."

The Geysir is a Norwegian square-rigged steel sailing ship, 283 feet long, 38½ feet beam, 1,918 gross tons, with three hatches opening into a common space below deck, for freight, without compartments. The construction of the Geysir required that, in order for her to stand up in the water, or navigate, she should have placed upon her ballast or stiffening, to weigh her down in the water. Pursuant to the provisions of the charter party, after duly discharging her cargo from her previous voyage, she gave notice to the charterers to furnish the stiffening required to enable her to proceed to Newport News, and thereafter 513 tons of coal were placed on board; the coal being treated as a part of the cargo to be taken on at Newport News. After the coal was placed aboard, and before the voyage was entered upon, the government forbade the vessel to sail, at least until the coal in question could be tested, with a view of determining whether it had become heated. The necessary steps were taken to that end, and it developed that the coal was heated, and in an unfit condition to be used for the purpose for which it was placed on board. The heating of the coal increased rapidly, and to such an extent that, upon the charterers being called upon to remove the same and their declining so to do, the master of the ship was forced to have it removed at great cost and expense to the owners of the vessel. Upon the coal stiffening being unloaded, the shipowner furnished 500 tons of sand for stiffening, which was put on board, and the vessel was towed from Baltimore to Newport News, as required by the charter party, where the cargo of coal for Rio was duly placed on board. Pending the loading of the vessel, and in order to take the sand ballast or stiffening from the ship, the vessel was transferred temporarily to Lambert's Point, where the same could be disposed of promptly, and the vessel then returned to Newport News, where the loading of the cargo was completed.

The Geysir seeks to recover as damages for the alleged breach of the charter party the sum of $33,866.16, made up of the following four items:

1. Extra expenses in Baltimore.....................................$ 3,410.21
2. Extra expenses in Norfolk......................................  1,852.45
3. Demurrage, 31 days at $600 (Baltimore, October 4 to 26, 22 days;
   Norfolk, October 28 to November 7, 9 days)................. 18,600.00
4. Freight, 513 tons at $19.50.................................... 10,003.50
                                                                 _____
                                                                 $33,866.16

Respondent insists that no recovery can be had for any part of the claim in suit; the contention being briefly, as respects the expenses incurred in connection with the unloading of the heated coal at Baltimore, the time consumed in connection therewith, and detention on account thereof, that the same was caused by reason of the governmental order in question, inhibiting the use of coal as stiffening, and that the charterer had in all respects fulfilled its duty in con-

nection with furnishing such stiffening, by exercising due and proper diligence in procuring the coal; that is to say, that it acquired it from reputable coal dealers, and that at most the charge against it should be made as for losses arising under the doctrine of general average. Counsel cite in support of their position the decision of Judge Ward, in the United States District Court for the Southern District of New York, in the case of Aktieselskabet Fido v. The Lloyd Brazileiro and others, 267 Fed. 733, and 13 other cases all heard together, filed July 19, 1919, involving questions claimed to be similar to the one under consideration here.

The court's conclusion is:

[1] First. Even conceding the nonliability of the respondent for damages arising from the heating of the coal cargo, in the ordinary case of affreightment, and that for the reasons stated it would not ordinarily be held as guarantor of the quality of the coal furnished, or responsible for losses incident to and arising from the combustible character of the cargo, still those considerations should not control in this case. Undoubtedly the cost incurred for providing stiffening or ballast for a ship that could not stand up without such support would be upon the ship, and not on the charterer. The charterer could make itself liable for such charges, if it wanted to do so, as it could for the ballast, and also for the hire of the tug to take the chartered vessel from Baltimore, where it was discharging cargo, to Newport News, where it was to take on cargo. That the towage service was rendered is not disputed, nor is the fact that coal was furnished by the charterer for ballast, pursuant to the terms of the charter party in respect thereto. The coal so furnished proved to be unfit and unsuitable for the purpose of taking the vessel to Newport News. It had become heated, seriously endangering the vessel, so much so that at great cost and expense it was taken from the ship, and subsequently sold for what could be gotten for it, and upon suitable ballast being furnished by the shipowner the voyage to the port of loading was completed. The charterer refused to unload the burnt coal, and the Geysir was forced to remove the same at the ship's expense and with much trouble, inconvenience, and cost to her owners in unloading and disposing of the same. There seems to be no good reason why the losses arising from this source should not fall on the charterer, who contracted to furnish the stiffening, rather than upon the vessel, which was greatly inconvenienced and damaged by its failure to do so. Nor should the charterer be relieved of liability because the government forbade the use of the unfit stiffening thus furnished. The action of the government was caused solely by the failure of the respondent to perform its obligation to furnish proper stiffening, and in what it did it acted solely in behalf of the public good, and because the respondent had furnished an unsafe ballast.

The expenses incurred at Baltimore, in discharging and disposing of the heated cargo, amounted to $3,410.21, which sum should be credited by $2,325.13, the net proceeds of the sale of the damaged coal, leaving a balance due in favor of the Geysir of $1,085.08. Likewise the vessel is entitled to recover for the time lost in the detention of the vessel,

caused by the respondent's fault, at Baltimore, in furnishing unsuitable stiffening; that is to say, the 22 days from October 4th to October 26th, at $600 a day (the sum agreed to in the charter party for the vessel for detention), amounting to $13,200. In this connection it may be said that in the time taken, as well as the cost incurred in the removal of the heated cargo at Baltimore, and the time consumed at Norfolk and Newport News, and the expenses there incurred, that generally the cost appears to be large, and the time consumed greater than was necessary; but when considered in the light of the testimony in this case, both items are readily accounted for. At the port of Baltimore, especially, the occurrences took place during the influenza epidemic, and it was next to impossible to secure labor. Many of the ship's crew were sick, and one had died, and both there and in Norfolk, during the war period, it was exceedingly difficult to secure barges or scows to load and unload stiffening or cargo of any sort.

Second. The charge for demurrage and detention at Newport News and Norfolk, 9 days, the court is disinclined to allow, as the same was caused largely by the inability of the vessel earlier to secure a berth at the piers, and the subsequent necessity of having to take the ship from Newport News to Lambert's Point and back to Newport News, with a view of expeditiously unloading the sand ballast. Unusual diligence was exercised by the charterer's agent in securing berth space at the pier as quickly as possible, and considerable delay was caused by the impossibility of securing barges and labor to unload the sand.

[2] Third. Considering the item of $1,852.45, for extra expenses incurred at Newport News and Norfolk, the court's judgment is that the same should be disallowed. $1,800 of the amount grows out of the necessity to discharge the 500 tons of sand ballast from Baltimore to Newport News; $1,400 being the actual cost of removal of the same, and $400 tug hire for towing the ship from Newport News to Lambert's Point, and returning her to Newport News. This item involves the question of upon whom should fall the cost of discharging the ballast at Norfolk, in the light of the provisions of the charter party respecting the same, and the court is influenced in its conclusion by the fact that stiffening or ballast is necessarily incident to the operation of the vessel, and when the charterer furnished the ballast, under the special contract, to carry the ship to Newport News, it discharged its obligation in that respect.

But for the special provision of the charter, whereby the charterer contracted to "furnish free stiffening when and where required by the master," and "to pay the vessel's towage from Baltimore to the loading port," the vessel would have been required to provide for her proper ballast, as well for the purpose of navigation to the port of taking on cargo, as to enable her to load preparatory to her final voyage. The fact that the charterer contracted to furnish ballast to carry the vessel to Newport News did not, in the absence of like obligation to do so, impose upon him the obligation to remove the same on arrival there, after it was no longer necessary to the safety of the vessel. Upon the vessel's placing enough of her cargo on board to make ballast unnecessary, it became desirable to remove the sand ballast, with

a view of providing the necessary cargo space to enable the ship to perform its contract of affreightment, and carry its full capacity of 2,800 tons. Manifestly this expense should be borne by the ship, as between it and the charterer. Carver's Carriage of Goods by Sea (5th Ed.) § 262; Scrutton on Charter Parties and Bills of Lading, pp. 79, 126, and notes; Poor on Time Charters, §§ 4 and 22; Wier v. Union S. S. Co., [1900] L. R. 1 App. Cas. 525. The last citation, a decision of the House of Lords, contains a full and interesting discussion of the ship's liability for ballast, and is quite conclusive of the subject. In The Port Adelaide (D. C.) 59 Fed. 174, and Ruprecht v. Delacamp and others (D. C.) 165 Fed. 381 (affirmed 169 Fed. 1022, 95 C. C. A. 333), will be found incidentally a further consideration of the same subject.

[3] Fourth. This leaves for consideration the last-named item of libelant's claim for $10,003.50, freight on 513 tons of coal, at $19.50 per ton. This apparently arises in this way: At the time of the loading of the coal stiffening at Baltimore, it was understood between the parties that it would be treated as part of the cargo of coal from Newport News to Rio; that is to say, having on board that much coal on arrival at Newport News, she would take up a supply sufficient to make the full cargo of 2,800 tons there, which was done, a bill of lading issued for the 513 tons, and the charterer paid the freight thereon at Baltimore. Subsequently, and before the ship's departure, this coal had to be taken off for reasons hereinbefore stated, and sand ballast supplied in its stead, the ship taken to Newport News, where it took on the full cargo of 2,800 tons of coal, and freight was paid on that quantity, less the 513 tons, the subject of this dispute. The libelant seeks to recover for the full cargo of 2,800 tons transported from Newport News, as well as that taken on board at Baltimore, and afterwards removed. To state this claim is to answer it, as the effect of what the libelant would do is to receive payment as well for the 513 tons not carried as for that which made up a part of the 2,800 tons taken on at Newport News. The claim is wholly without merit, in the court's judgment.

A decree in accordance with the foregoing views will be entered on presentation.